UNITED STATES, Appellee

v.

ROBERT W. ADAMS, Private First Class, U. S. Army, Appellant

5 USCMA 563, 18 CMR 187

No. 5300

Decided April 1, 1955

Lt Col George M. Thorpe, U. S. Army, Maj Edwin Doran, U. S. Army, 1st Lt Robert C. Taylor, U. S. Army, and 1st Lt Richard C. Shadyac, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, Lt Col Charles M. Munnecke, U. S. Army, for Appellee.

### Opinion of the Court

Robert E. Quinn, Chief Judge:

A general court-martial convicted the accused of two specifications of murder in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712, and sentenced him to a dishonorable discharge, total forfeitures, and confinement at hard labor for twenty-five years. On appeal, a divided board of review affirmed only a finding of guilty of voluntary manslaughter, and modified the sentence by reducing the period of confinement to fifteen years. We granted further review to consider certain claims of error by the accused.

On December 8, 1953, a part of the accused's battalion was encamped in a training area in Korea. The personnel were quartered in squad tents. In the early evening, the accused, Corporal R. Hughes, and two other persons were engaged in a stud poker game in one of the tents. A few men watched the game. At the turn up of a hand dealt by one of the others, Hughes charged that the accused cheated. He asserted that the accused had six cards, one of which came from the dealer's discard. The accused denied the charge and, claiming to be the winner, he took up the money. Thereupon, Hughes threatened to kill the accused; he "invited him outside."

Hughes was about the accused's build and height, but weighed approximately five to fifteen pounds more. As they proceeded to the tent entrance, the accused pulled a bayonet from a scabbard. Outside the tent, however, they were separated by other soldiers. Hughes again made "some smart remark about going to kill the accused" before morning.

The accused went to his own tent. He took his rifle from under his bunk, put in a full clip of bullets, inserted a round into the chamber, and put on the safety. He remarked to a tentmate "this is in case he come [sic] in and starts messing with me after I get to

sleep." He talked with others in the tent. There were eleven persons present. A few minutes later, Hughes came "tearing at the front door." He kept shouting to the accused that he wanted his money or he would kill him. A Sergeant Flanagan opened the tent flap. Hughes came in. He had two fist-sized rocks in his hands. He started down the aisle, but apparently stopped when he saw the accused holding his rifle. Hughes seized Flanagan to use him as a shield.

According to Flanagan, the accused remarked, "come back here and get it." The accused then approached Hughes, pushed him in the chest with the barrel of his rifle, forcing him back. Hughes still insisted he wanted his money, or he would kill the accused. The accused's only reply was "get out of here . . . leave me alone."

As they moved back toward the tent entrance, the accused kept prodding Hughes with the rifle. Suddenly, Hughes bent down and snatched a rifle from under a cot. He also seized a clip from a cartridge belt hanging on the edge of the cot. He inserted the clip into the gun. The muzzle pointed in "the general direction" of the accused. The accused "knocked the safety off" his own weapon and fired twice. One shot killed Hughes. The other passed through the tent, entered another nearby, and lodged in the back of the skull of a Sergeant Garcia. He, too, was killed.

Witnesses testified that the action was very fast. One described the seizure of the rifle by Hughes as "one, swift, grab, grab, grab, deal." Flanagan estimated the interval of time between the accused's last push and the shooting as "a matter of seconds." A third witness said he turned around to extinguish a candle that had fallen down; when he looked up he saw Hughes with the rifle, and "it was just a moment until he fell." Several of the persons present testified that if the accused had not shot Hughes, he would have killed the accused. Typical is the testimony by one that, "The way things were happening, Adams would have gotten shot if he didn't shoot Hughes."

Immediately after the shooting, the accused appeared to one witness to be in a "sort of hysterical state." Some of the bystanders heard him say, "He made me do it," or "I had to do it." Flanagan said that the accused "turned around and said, You see, it was self-defense."

The accused voluntarily gave a pre-trial statement to the Criminal Investigation Division agents which was admitted in evidence, and he also testified at the trial. The statement and his testimony are inconsistent, but the inconsistencies are not important on this appeal. In his testimony, the accused said he was reading a letter when Hughes started the commotion outside the tent. Hughes kept "pressing me" so he picked up his rifle and an ammunition clip and started loading the weapon. Someone called, "Look out, Adams." He hurriedly completed the loading, and started toward the front of the tent. He did not notice anything in Hughes' hands. When he reached Hughes, he pushed him in the chest with the rifle. He told Hughes "[he] didn't want this; [he] . . . didn't want no trouble or for him to lose his stripes." When Hughes seized the rifle from under the bed and loaded it, he "got scared and nervous." He "figured" that he could not run. His general reaction is expressed in the following excerpts from his testimony.

"Q What was the reason you pulled the trigger?

A He was releasing the bolt, he let his hand go from the bolt, and I knew the bolt was going home; I knew I would have to shoot, or he would have killed me.

"Q Do you feel that he meant to shoot you?

A Yes, I do, sir.

• • • • • •

"Q Now, when you were backing Hughes up, and the rifle was pointed, and he went to pick up a rifle and turned to get that clip of ammunition, did you stand there and watch?

A My reaction was to run, but I was too scared, because if I run, he would have shot me.

"Q So you let him grab the rifle?

You just stood there and watched him pick it up?

A After he grabbed the rifle, I started to run, but I was scared and I figured he would have shot me."

The accused's first contention is that the evidence is insufficient to support the conviction for voluntary ■ manslaughter. Voluntary manslaughter is an unlawful killing in the heat of sudden passion caused by adequate provocation. In certain circumstances, the passion may be engendered by fear. Cf. United States v. Black, 3 USCMA 57, 11 CMR 57. Fear, however, may also provide the predicate for a claim of self-defense. The ultimate effect of the emotion must be judged in relation to all the surrounding circumstances. See United States v. Troglin, 3 USCMA 385, 12 CMR 141. Here, the accused testified that he shot Hughes because he feared that otherwise Hughes would kill him. But his testimony and the other evidence do not only raise an issue of self-defense, they also provide a basis for a determination that the accused acted from sudden passion and without motive. As was pointed out by the United States Supreme Court in Stevenson v. United States, 162 US 316, 40 L ed 980, 16 S Ct 839:

". . . It is difficult to think of a case of killing by shooting, where both men were armed and both in readiness to shoot, and when both did shoot, that the question would not arise for the jury to answer whether the killing was murder or manslaughter, or a pure act of self-defense."

A board of review has the power to make findings of fact. Here, it found against the accused on the issue of self-defense, and determined that the evidence showed that he acted from heat of passion. Sufficient evidence supports the findings and we are, therefore, bound by them.

We turn next to the accused's claim that the law officer erred in instructing the court on the law of self-defense. A majority of the board of review was "not at all certain" that the instruction did not prejudice the accused, but it concluded that it cured the prejudice by its findings of fact in reducing the offense from murder to voluntary manslaughter. We do not agree with that conclusion.

Self-defense is a defense to every degree of a homicide. United States v. Weems, 3 USCMA 469, 13 ■ CMR 25. Consequently, if the law officer materially misinstructed the court on the law relating to self-defense, he deprived the accused of the right to complete exoneration. Mere reduction in the degree of the offense does not cure the error. Therefore, the merits of this assignment of error must be carefully considered.

In his opening argument, trial counsel maintained that there was "not much dispute over the facts." He contended that the single question was whether the homicide could be "justified on the ground of self-defense." His argument is devoted exclusively to a refutation of that defense. In part, he said:

". . . Now, it is true that the law provides that a person may be excused for a killing if that killing is necessary to save his own life. However, the law does not permit any necessity in taking another person's life until the person who does the killing has retreated as far as he can safely retreat unless, of course, he is in his own home or in a place where he had a duty to remain. This accused person was definitely not where he had a duty to remain, nor in his own home; and when we say that we will excuse a person from retreating, we mean exactly that . . . his own home. A home is a dwelling, a place with walls and ceiling and furniture and a roof, and we are not talking about a tent in which a person lives one week and lives somewhere else the next week. The accused had no right to kill because he was in a tent in which he had a bunk. He had no right to take a life.

"The law further provides, as the law officer will advise you, that a killing is not justified until the accused person has assumed the duty to retreat. He has to affirmatively assume that duty to retreat and unless

568

he does so, the killing is murder and there is no ground for excusing it as self-defense; I ask you to look at all the evidence in this case to see whether you find one instance during all that happened on 8 December when the accused shot Corporal Hughes, to show that he even made an attempt to retreat. When he killed Corporal Hughes, he didn't retreat a single step."

Before making his own closing argument, defense counsel interposed a "conditional" objection to the "definition of a home" as given by the trial counsel. The condition was that the law officer provide a "legal definition."

The law officer overruled the objection. Later, he instructed the court as follows:

". . . To be excused for killing in self-defense, a person must have believed on reasonable grounds that the danger of being killed himself or of receiving great bodily harm was imminent, and no necessity will exist until the person, if he is not in his own house or at a place where he has a duty to remain has retreated as far as he safely can. Further, to avail himself of the right of self-defense, the person must not have been the aggressor or intentionally provoked the altercation with the victim, but if after provoking a fight the person withdraws in good faith and his adversary follows and renews the fight, he is no longer the aggressor and may avail himself of the right of self-defense. If, however, a person provokes an assault upon himself in his own house he cannot invoke the rule excusing a person assaulted on his own premises from retreating. And a person who is the aggressor or who needlessly resumes a fight gains no immunity because he is in his own house. In this connection the term 'house' means presumptively a dwelling house and 'own' means belonging to oneself.

"With respect to the defense of self-defense, I have instructed you that to be excused for killing in self-defense, a person must have believed on reasonable grounds that the danger of being killed himself or of receiving great bodily harm was imminent, and no necessity will exist until the person, if he is not in his own house or at a place where he has a duty to remain has retreated as far as he safely can.

"The matter of retreat must be governed by the following rule:

"Assuming danger is imminent, before a killing can be excused, the accused must assume the duty to retreat; that duty is measured by the force and imminence of the danger and the availability of an opportunity by which the accused may retreat reasonably without increasing his peril."

Undoubtedly, in his closing argument to the triers of fact, counsel has a right to discuss the law applicable to the case. See: State v. Burks, 196 La 374, 199 So 220. The court, however, must take its law, not from counsel, but from the law officer. It is, therefore, proper for the law officer to stop an argument which misstates the law. See: Shaw v. State, 188 Miss 549, 195 So 581; State v. Richardson, 349 Mo 1103, 163 SW2d 956. A failure to interrupt is not fatal. The giving of correct instructions by the law officer is generally sufficient to remove the influence of counsel's misstatement of law. King v. State, 156 Fla 817, 24 So2d 573. Shaw v. State, supra. However, under certain circumstances a law officer may adopt counsel's statements of law, and make them part of his instructions to the court.

In United States v. Smith, 2 USCMA 440, 9 CMR 70, the law officer did not formally enumerate the elements of the offense charged. However, defense counsel correctly delineated the elements in his closing argument. The law officer referred to this delineation. We held that, by his reference, the law officer effectively incorporated defense counsel's statement into the instructions. A similar situation was presented to the Supreme Court of Pennsylvania. In Commonwealth v. Capalla, 322 Pa 200, 185 Atl 203, the accused was charged with murder. He defended on the

ground of self-defense. The defense counsel objected to a statement by the district attorney in closing argument, that there "is no reason ever for shedding human blood except in war." The objection was overruled and the trial judge indicated that he thought the argument was justified by the evidence. The appellate court held that the prosecutor's statement was plainly erroneous. It noted that the misstatement of law was acquiesced in by the court. Consequently, it was quite likely to be considered by the jury. Here, defense counsel also objected to a pronouncement of law by trial counsel. His objection was overruled by the law officer. Later in his formal instructions, the law officer substantially adopted the definition of a home given by trial counsel. Therefore, the latter's exposition of the law must be considered along with the law officer's instructions for the purpose of ascertaining the legal standards by which the court measured the accused's defense.

It is clear that the significance of trial counsel's distinction between a home and a tent is its emphasis upon the theory that the accused had no legal right to kill, without first showing that he actually retreated. Upon the facts of this case, the stress on the necessity of retreat is wrong.

The law officer did not correct the mistake inherent in trial counsel's argument. On the contrary, he acquiesced in, and emphasized, it by substantially adopting the attempted differentiation between a tent occupied as living quarters by military personnel, and a dwelling house. The Government contends that the law officer's use, in the definition, of the word "presumptively" left the court free to determine whether the tent should be equated to the accused's dwelling. We doubt that any court member would reasonably interpret the instruction in that light.

A dwelling house is not a mere physical structure of a particular kind; it is a place in which human beings live. It may be a hotel room, an apartment, an entire building, as in the case of a single family residence, or a tent. State v. Holbrook, 98 Ore 43, 188 Pac 947.

**570**

Cf. United States v. Love, 4 USCMA 260, 15 CMR 260.

Generally a military person's place of abode is the place where he bunks and keeps his few private possessions. His home is the particular place where the necessities of the service force him to live. This may be a barracks, a tent, or even a foxhole. Whatever the name of his place of abode, it is his sanctuary against unlawful intrusion; it is his "castle." And he is there entitled to stand his ground against a trespasser to the same extent that a civilian is entitled to stand fast in his civilian home. No reason in law, logic or military necessity justifies depriving the men and women in the armed forces of a fundamental right to which they would be entitled as civilians. Consequently, when the accused retired to his own tent, he retreated as far as the law demands. The law officer erred in failing to make that clear to the members of the court.

The law officer's error was emphasized by the stress he laid on the requirement of exclusive title. The court members would certainly not regard military sleeping quarters as "belonging to" an accused. It would inevitably conclude that a tent in a military training area belongs to the Government rather than to a particular person in the service. The law of self-defense is not applicable only to one who can show a title deed to his dwelling. A person may protect himself against the force and violence of a trespasser whether or not he owns the title to his place of abode. The test is not legal ownership, but the right to peaceful possession.

The basis of self defense is necessity. In Brown v. United States, 256 US 335, 65 L ed 961, 41 S Ct 501, **Headnote 8** the Supreme Court said:

". . . Rationally, the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; not a categorical proof of guilt. The law has grown, and even if historical mistakes have contributed to its growth, it has

tended in the direction of rules consistent with human nature. Many respectable writers agree that if a man reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant, he may stand his ground, and that if he kills him, he has not exceeded the bounds of lawful self-defense. That has been the decision of this court. Beard v. United States, 158 US 550, 559, 15 S Ct 962, 39 L ed 1086, 1090. Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore, in this court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety, or to disable his assailant rather than to kill him."

In United States v. Troglin, 3 USCMA 385, 12 CMR 141, we elaborated on the Brown case, and pointed out that the necessity depends upon the facts and circumstances presented by the evidence, "of which the possibility of retreat is only a part." Ibid, page 391. The factual situation may indicate that the accused was "foreclosed from retreating." Ibid, page 393. In such a case, the accused's right to self-defense is not lost because he does not pause to consider ways of escaping the imminent danger. Brown v. United States, supra. People v. Turner, 385 Ill 344, 52 NE2d 712. Here, there is substantial evidence from which the triers of fact could conclude that the danger to the accused was so great and so imminent as to justify his standing his ground. Moreover, the accused was in his "own home" and he had no obligation to retreat before defending himself against an armed intruder. However, the law officer did not define the accused's right to stand his ground. Instead, his instructions plainly left the court with the erroneous impression that the accused's tent was not his home, and that it had to find the accused affirmatively retreated before it could return a not guilty verdict. But, under the facts, the accused had no duty to stop to consider whether he might "fly with safety, or . . . disable his assailant rather than . . . kill him." United States v. Brown, supra, page 343. The law officer, therefore, failed to provide the court with the proper guideposts on the law of self-defense as it applied to the facts in this case. United States v. Weems, 3 USCMA 469, 13 CMR 25.

Although accorded an opportunity the accused did not object to the instructions. Consequently the Government contends he waived his right to question them on appeal. We find no merit in this contention. Defense counsel had affirmatively objected to trial counsel's definition of a dwelling. He also specifically requested the law officer to instruct the court properly on that subject. However, the law officer not only overruled his objection but in his instructions expressly adopted the same erroneous definition. Under these circumstances, the defense counsel was not required again to object. See United States v. Landrum, 4 USCMA 707, 714, 16 CMR 281; United States v. Lowery, 4 USCMA 448, 453, 16 CMR 22. The issue, therefore, was preserved for appellate review.

In view of the determination of prejudice resulting from the instructions as to the accused's defense, we need not consider the separate claims of error in connection with the charge relating to Garcia. These may not reoccur in a new trial.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside, and a rehearing is ordered.

Judges LATIMER and BROSMAN concur.