UNITED STATES

v.

**Johnie R. McCORMICK, 236 92 1088, Boiler Technician Fireman Recruit (E–1), U. S. Navy.**

NMCM 81 3560.

U. S. Navy-Marine Corps Court of Military Review.

18 June 1982.

MAJ James P. Axelrod, USMC, Appellate Defense Counsel.

LT Daniel Lippman, JAGC, USNR, Appellate Defense Counsel.

LCDR Michael R. McGuire, JAGC, USN, Appellate Government Counsel.

Before CEDARBURG, C. J., and GORMLEY and MAY, JJ.

MAY, Judge:

Appellant was convicted, in absentia, by a general court-martial with officer members of violating Articles 80 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880 and 934, for the offenses of attempted rape and communication of a threat. He was sentenced to a dishonorable discharge from the naval service, confinement at hard labor for 7 years, and forfeiture of all pay and allowances.

The pertinent factual circumstances underlying this case, as extracted from the trial record, involve the alleged sexual assault of a nine-year old female dependent within a military housing area in Pearl Harbor, Hawaii. The attack allegedly took place during the early morning hours of 29 November 1980. Naval Investigative Service (NIS) agents were informed of the alleged assault within hours of the incident by base police officers. The agents then interviewed the victim and the victim's mother at the Navy Regional Medical Center (NRMC), Pearl Harbor. During the interview the assailant was identified as a John McCormick, who apparently was a close social friend of the victim's mother. The agents were informed by base police officers that they had determined that John McCormick was assigned to the USS WARDEN (CG 18) and was assigned shore billeting in Room 306, Bachelor Enlisted

Quarters (BEQ) 1333, at Pearl Harbor. Base police officers further advised the NIS agents that John McCormick was an unauthorized absentee from his ship. The agents were advised during an interview with the victim that the assailant, at the time of the assault, was wearing a blue shirt, blue jeans, and white jogging shoes.

Following an inspection of the victim's residence, the NIS agents, Agent B and Agent H, accompanied by a uniformed base policeman, entered BEQ 1333 and knocked on the door of Room 307. After receiving no response to their knocking, the agents, after leaving a base policeman at the door to Room 307, located the BEQ manager. The manager verified from his master files, the assignment of a John McCormick to Room 307 and offered to open the room to determine if McCormick was inside. The manager accompanied the agents back to Room 307 and knocked on the door. After receiving no response from within the room, the BEQ manager, using his pass key, unlocked and opened the door to the room. The manager then identified a person lying in a rack immediately in front of the doorway as being John McCormick. The NIS agents then identified themselves to that person, the appellant herein, placed him under apprehension, and advised him that he was being arrested for the "assault of a young girl." The appellant, who was at that point, wearing only a pair of jockey shorts, was given a pat-down search. Agent B then requested the consent of appellant to search of his personal effects in the room, which at that time was apparently solely occupied by appellant.

Appellant's response to the agent's request was: "Yeah, sure, search", "help yourself". The agents then seized a pair of blue jeans lying in full view at the foot of the rack in which appellant had been lying; a blue shirt lying in full view on a couch in the center of the room, and a pair of white jogging shoes lying on the deck beside the doorway. Appellant was then directed to remove the pair of underwear shorts he was wearing, which was also confiscated by the agents. At this time, Agent B observed several excoriations, or abrasions, on appellant's genitalia. Appellant was then directed to dress and accompany the agents to the local NIS office.

During the 2½-hour interrogation which followed a full rights advisement and acknowledgment, the appellant initially denied any involvement in the alleged offenses. He subsequently, however, following further interrogation, admitted sexual contact with the victim. Appellant declined to execute a written sworn statement.

Following the interrogation, appellant was taken to the Navy Regional Medical Center (NRMC) at Pearl Harbor for a preconfinement physical. Lieutenant Commander H, a medical officer assigned to NRMC, Pearl Harbor, conducted the examination. Prior to the examination the doctor was informed by Agent B of that agent's earlier observations of the genital abrasions. The doctor then noted and examined the excoriated area of appellant's genitalia during the preconfinement physical examination.

Appellant was present during the resulting Article 32 investigation, the preliminary Article 39(a), 10 U.S.C. § 839(a) sessions of the trial, and arraignment on the charges. At the opening session before members, however, it was determined by the military judge, following evidentiary submissions by the Government, that appellant had voluntarily absented himself from the proceedings and the trial was continued in accordance with paragraph 11, *Manual for Courts-Martial, 1969 (Rev.)* (MCM). Appellant, subsequent to completion of the trial, surrendered himself to military authorities in Norfolk, Virginia.

Appellant now assigns the following errors:

I

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY DENYING THE APPELLANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM APPELLANT'S BARRACKS ROOM AND ALSO APPELLANT'S CONFESSION.

## II

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY ALLOWING THE TESTIMONY OF DR. [H] OVER THE OBJECTION OF APPELLANT.

## III

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING APPELLANT'S MOTIONS FOR MISTRIAL, DUE TO IMPROPER AND PREJUDICIAL ARGUMENT BY THE TRIAL COUNSEL.

## IV

THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT WAS GUILTY OF THE OFFENSES CHARGED.

## V

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ADMITTING PROSECUTION EXHIBIT 16 INTO EVIDENCE IN AGGRAVATION OVER DEFENSE OBJECTION.

We find no merit in assignments III and IV and will address the remaining assignments in turn.

## I

At trial, appellant's civilian counsel moved to suppress the physical evidence seized in appellant's room as well as appellant's subsequent admission as being the product of an unlawful arrest. Appellant relies upon the decision rendered in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). That decision held as violative of the Fourth Amendment, warrantless arrests in private dwellings, absent exigent circumstances.

The salient concept proffered by appellant in his reliance upon *Payton, supra,* is the assumed consonance of character between a private dwelling and a military barracks. That assumption is incorrect and entirely erroneous. While we perhaps might be inclined to view as self-evident the distinctions between the constitutional sanctity of a private dwelling and that of a barracks built and designed for the housing, within military control and discipline, of members of the armed forces, we will express the views which support our rejection of the assignment.

The Government agents in this case were clearly authorized to effect the apprehension of appellant based on the information available to them at the time they entered BEQ 1333. *See* Article 7, UCMJ, 10 U.S.C. § 807; paragraph 19, MCM. Did the locked door of Room 307 represent a sanctuary protected by the Fourth Amendment, requiring an authorization by appropriate authorities for entry into the room? We think not. While appellant places some reliance upon the holding in *United States v. Adams*, 5 U.S.C.M.A. 563, 18 C.M.R. 187 (1955), in viewing a military barracks as an area of privacy and personal prerogatives, that decision can be distinguished clearly on the facts and legal issues present in that case. The issue in *Adams* involved the correctness of the law officer's instruction distinguishing a military tent from a private dwelling where the facts in that case involved a shooting by the accused of another soldier after the accused had retreated to his assigned tent following an earlier altercation. The legal issue obviously dealt with the right of self-defense. The legal issues and factual circumstances of *Adams, supra* bear no resemblance to the case *sub judice.* While the language of the opinion in *Adams* may support a view that a man's barracks is "his castle", *Adams, supra* at 194, that "castle" is not immune to the entry of Government agents attempting the apprehension of military personnel suspected of offenses under the Code. A military barracks or berthing area may be a foxhole in a remote training or combat area or it may be the almost mythical condominiums referred to in recruiting brochures and motion pictures. It may be represented by elaborate areas of

individual room configuration designed to accord to the service member a measure of personal privacy and protection from the more raucous environment of a ship's berthing area or an open squad bay. The range of such architectural designs does not represent a granting of sanctuary areas inconsistent with the control and discipline of a military organization. *See United States v. Middleton*, 10 M.J. 123, 128, n.3 (C.M.A. 1981). Military society has a distinct and necessary character apart from that present in the civilian society. *See Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Conversely, the on-base housing of military personnel with their dependents and the voluntarily chosen off-post housing of individual service members do not embody that essential military character or the dictates of military necessity. *See United States v. Mitchell*, 12 M.J. 265, 269 (C.M.A. 1982).

■ The individual's expectations or possible perceptions of privacy, based on the design of the military barracks or the degree of freedom accorded therein by the military commander, does not establish a barrier against the exercise of military authority or police powers. To hold otherwise would impose upon military commanders the requirement to maintain wholly open, public berthing areas for their personnel. It would require military commanders to avoid any modern barracks construction in order to insure that their authority to maintain discipline and control over their on-base barracks was judicially recognized. If appellant's contention of immunity from warrantless arrest authority while in his barracks room was accepted, what manner of necessary controls could be applied by military authority over the living conditions and security needs of our large on-base barracks populations?

■ The Fourth Amendment correctly, in our view, has been extended by *Payton* over private dwellings. A military barracks, no matter the manner or design of its construction, is *not*, however, a private dwelling. Its military character is distinct and necessary to the effective functioning of any military unit. We are not reluctant, therefore, when balancing the individual liberties of our military personnel against the needs of military command and control, to subordinate in such clearly defined areas, the individual to the greater, unique needs of the military society.

> From his first day in boot camp, the soldier has come to realize that unlike his civilian counterpart he is subject to extensive regulation by his military superiors. The soldier cannot reasonably expect the army barracks to be a sanctuary like his civilian home.

*Committee for G.I. Rights v. Calloway*, 518 F.2d 466, 477 (D.C.Cir.1975).

■ We specifically hold, therefore, that military authorities may enter, barracks and berthing areas, without arrest authorizations specifically related to such areas, barracks berthing areas, for the purpose of effecting the lawful apprehension of persons subject to military authority or for the purpose of apprehending these persons who, while not subject to military jurisdiction under the Code, are properly the subject of the commander's concern for the safety and security of his or her command.

■ We therefore find that the Government agents herein were acting upon a reasonable belief that an offense had been committed and that appellant had committed that offense. We find that appellant's apprehension within his assigned room in BEQ 1333 was lawful. We further find that the seizure of the items of appellant's clothing was proper under the concept of plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The NIS agents entered appellant's room for the purpose of effecting the apprehension of appellant within hours of an alleged sexual assault in which he had been named as the perpetrator. From our examination of the record, we find no attempt at subterfuge by Government agents, such as structuring an apprehension in order to facilitate an otherwise unauthorized search. If we were presented with the circumstances of the asserted "consent" search supposedly authorized by appellant's verbal assent

within his room, moments after being apparently awakened by two NIS agents, one uniformed base policeman, and the BEQ manager, we would be compelled to observe the similarities between that friendly conference and that presented in *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 3118 (1969). We need not address the issue of the voluntariness of appellant's consent to the search of his room, however, as each of the clothing items seized had been previously described to the NIS agents by the victim, were observed by the agents in plain view, and properly seized.

Turning to appellant's contention that his confession made during later interrogation was either involuntary or the product of an unlawful arrest, we find no merit to that contention. Based on our examination of the record, we find appellant was adequately advised of his rights under Article 31, UCMJ, and *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), and that he acknowledged his understanding of those rights, and that his subsequent admission was the result of a voluntary and informed decision. We find, therefore, that appellant's first assignment of error is without merit.

## II

Appellant contends that the testimony of Lieutenant Commander H should have been suppressed because it was based upon observations of appellant's body in violation of Rule 312, Military Rules of Evidence, and that the probative value of the evidence was outweighed by its prejudicial effect. Mil.R.Evid. 403.

Appellant contends that, as the medical officer's stipulated testimony indicates, an examination of a prospective confinee's genitalia is not normally the subject of a preconfinement physical; such a clear deviation from established procedure was an unreasonable and unauthorized search and not necessary in relation to any of the purposes of such preconfinement examinations.

■ We do not concur with appellant's constricted view of the rules of evidence. Rule 312(f), Military Rules of Evidence, specifically recognizes the necessity for certain physical examinations of military personnel by appropriate medical personnel. SECNAVINST 1640.9, paragraph 301.1h(1), directs that all persons, prior to acceptance for confinement, shall be examined by qualified medical personnel to determine their fitness for confinement. In part, the regulation requires that the "examining official shall note on the original form [the confinement order] the presence of cuts, bruises, or unusual marks." *Id.* Whatever may have been Lieutenant Commander H's previous experiences with such examinations and however he may have been informed of possible cuts or abrasions on appellant's body, he was required as the examining medical official to note and examine all externally observable injury or trauma to appellant's outer body prior to confinement. In addition, the further purpose presented in Rule 313, Military Rules of Evidence, regarding inventories was addressed in the physical examination of appellant. The general view of inventories as somehow limited to the inspection and accounting of inanimate objects fails to recognize a legitimate and reasonable purpose of such preconfinement physical examinations. Brig authorities must be aware of any apparent physical injuries or disabilities prior to the confinement of prisoners to insure appropriate work assignment decisions once the individual is incarcerated. Brig authorities, the prisoner, and command authorities also have a justifiable interest in the recordation of the physical condition and state of health of a prisoner immediately prior to his placement within the brig. Such examinations therefore, have legitimate administrative purposes recognized in Rule 313.

It is irrelevant how, and in what manner, the medical officer was informed of appellant's apparent physical trauma. His subsequent examination of appellant's genitalia and noting of longitudinal abrasions thereon were clearly authorized and required, and his subsequent recounting of his observations, while obviously prejudicial to appellant's not guilty plea to the offense of attempted rape of the nine-year old victim,

were sufficiently probative to justify the trial judge's ruling. We, therefore, reject appellant's second assignment of error.

## V

Appellant contends that Prosecution Exhibit 16 was admitted in error, over objection by trial defense counsel. We agree.

 The exhibit as offered, contains insufficient evidence of appellant's understanding and waiver of his right to refuse a summary court-martial. *See United States v. Mack,* 9 M.J. 300 (C.M.A.1980); *United States v. Booker,* 5 M.J. 238 (C.M.A.1977). However, we find the error in admitting a summary court-martial record involving three brief periods of unauthorized absence and an offense of missing the movement of his ship through neglect, represents minimal prejudice to appellant when ranged against the offenses of attempted rape of a minor child and a subsequent communication of a threat to the victim, of which appellant was properly convicted. Upon reassessment of the sentence, we find it to be fully justified and appropriate.

Accordingly, we find, after examination of the entire record of trial, the assignment of error by appellate defense counsel, the Government reply thereto, and the comments of the civilian defense counsel submitted in response to the staff judge advocate's review, that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings and sentence as approved on review below, are affirmed.

Chief Judge CEDARBURG and Judge GORMLEY concur.