UNITED STATES

v.

Thomas M. WISNIEWSKI, 303 78 0169,
Lance Corporal (E–3), U.S.
Marine Corps.

NMCM 84 2363.

U.S. Navy-Marine Corps Court of
Military Review.

Sentence Adjudged 24 Feb. 1984.

Decided 6 Dec. 1984.

LTCOL M.W. Lucas, USMC, Appellate Defense Counsel.

LT John B. Consevage, JAGC, USNR, Appellate Defense Counsel.

LCDR John B. Holt, JAGC, USN, Appellate Government Counsel.

Before EOFF, C.J., and MAY and RAPP, JJ.

MAY, Judge:

Appellant was convicted contrary to his pleas, by general court-martial, military judge alone, of possession of a prohibited drug with intent to distribute and of distribution of that drug in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad conduct discharge, confinement at hard labor for 9 months, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved only so much of the sentence as provided for a bad conduct discharge, confinement at hard labor for 6 months and 17 days, forfeiture of all pay and allowances, and reduction to pay grade E–1.

Appellant now assigns two errors. Our agreement with the first assignment renders unnecessary any addressal of the second assignment:

I

THE MILITARY JUDGE ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE AND STATEMENTS OBTAINED AS A RESULT OF AN ILLEGAL SEARCH AND SEIZURE CONDUCTED BY SERGEANT KEANE.

*Factual Background*

The following factual circumstances are extracted from the trial record:

At approximately 1300 on 16 December 1983, on board Marine Corps Air Ground Combat Center, Twentynine Palms, California, a Corporal Seipp, USMC, while delivering the platoon mail, knocked on the door of Sergeant Keane, the senior platoon noncommissioned officer living in the barracks, Building 1464. Corporal Seipp expressed his belief that illegal drug trafficking was occurring in the room of another platoon member, Lance Corporal Lansing. Lansing's room # 414, was located two doors away from Sergeant Keane's room. The apparent basis of Corporal Seipp's suspicions was the number and known character of persons observed frequenting Lansing's room. Following this conversation, Sergeant Keane walked out of his room and observed over a period of approximately two hours, 20–30 persons, all suspected of, or previously involved in, illegal drug involvement, knocking individually on Lansing's room. Lance Corporal Lansing, however, was on guard duty at the time and his only assigned roommate was on leave. Several of the persons, after receiving no response to their knocks on Lansing's door, asked Sergeant Keane regarding Lansing's whereabouts, and were informed of Lansing's guard duty assignment. All of these persons were apparently not members of the platoon.

At approximately 1630, Sergeant Keane observed two persons known to be assigned outside the platoon, knocking on Lansing's room. These two persons, known to Sergeant Keane as Lance Corporal Turner and Hospitalman Irish, after receiving no response to their knocks on Lansing's door, asked Sergeant Keane if he knew the whereabouts of Lansing. Sergeant Keane replied that he did not. Turn-

er and Irish then went to appellant's room which was located next door, on the far side, to Lansing's room. Sergeant Keane observed Turner and Irish talking to appellant, then the three persons left the barracks area.

Appellant was a fellow platoon member of Lance Corporal Lansing and both Marines had been in the habit of visiting each other's room on a frequent, almost daily basis, for almost a year. Appellant had not, however, ever stayed overnight in Lansing's room, nor did he store any of his personal possessions in the room. Appellant had no possessory interest in any property contained in the room, nor did he have a personal key of his own to Lansing's door or wall lockers inside the room.

Appellant had, however, during the period he, Irish and Turner were away from the platoon area after Sergeant Keane's first observation, been importuned by Lansing. Lance Corporal Lansing apparently requested appellant to effect the physical transfer of illegal drugs stored in one of the wall lockers in Lansing's room to Irish and Turner. Lansing then gave appellant the key to the room door and the key to the wall locker in which the drugs were stored. Appellant's testimony at trial expressed the belief that he had permissive access to Lansing's room for the period necessary to effect the drug transfer; that he had the authority during the period of his use of the room to exclude all other persons except Lansing and the other Marine assigned to the room, who at the time was on leave, and that he, the appellant, had the authority to admit other persons to the room, or in his words "... I would not have let the PMO in. But if it was someone that I knew."

After acceding to Lansing's request and receiving the keys to both the room door and Lansing's wall locker, appellant returned to Lansing's room with Turner and Irish. Sergeant Keane observed the trio enter the room and close the door behind them. Appellant testified that the door was locked and the blinds were drawn during the subsequent transfer of the drugs from inside Lansing's wall locker to Turner and Irish.

During the transfer process inside the room, Sergeant Keane had initiated further observation efforts. The sergeant testified that he was able to observe the actual transaction through the cord slot in one of the venetian blind slats, an opening estimated by the sergeant to measure $1/8'' \times 3/8''$ in dimension. Sergeant Keane testified that he observed appellant open up a wall locker in the room and transfer a white substance from a plastic bag to Irish and Turner. Suspecting a drug transaction, Sergeant Keane sent one of the nearby Marines for the officer of the day and invited several of the other nearby Marines to look into the room through the slot in the blinds. While the testimony of these other Marines confirmed the sighting of several male figures in the room while peering through the slot, none of the other witnesses could determine what, if any, actions were occurring inside the room.

Prior to the arrival of the officer of the day, the platoon sergeant, Staff Sergeant Lenard, arrived on the scene. Sergeant Keane related his observations to Staff Sergeant Lenard. Sergeant Keane then knocked on the door of Lansing's room. The door was opened by someone inside the room, Irish and Turner attempted to leave but were halted. Staff Sergeant Lenard ordered both to remain inside the room until the arrival of the officer of the day. Appellant asked "what was going on." Sergeant Keane responded by advising appellant that he had observed appellant engaged in a drug transaction, and that for appellant's "own benefit" he should surrender the drugs. Appellant's brief, albeit descriptive response was a short expletive accompanied by a banging of his, the appellant's, head against the wall locker. The platoon sergeant, Staff Sergeant Lenard then said to appellant, "Ski, give up the drugs." Appellant responded by pulling out a key from his pocket, opening a wall locker identified as Lansing's locker and removing a plastic bag containing a sub-

stance later identified as 90 "squares" of lysergic acid diethylamide.

From this pregnant meshing of evidentiary concepts and factual circumstances emerged the charges in this case and a suppression motion entered by appellant. Following presentation of the motion, the military judge denied the motion and made the following findings of fact:

The court does specifically find that Sergeant KEANE was not a law enforcement agent, that he was off duty, in civilian clothes, not a supervisor of nor exercised direct disciplinary powers over WISNIESWKI, IRISH or TURNER, as interpreted by applicable case law. Sergeant KEANE's assumption of responsibility for cleanliness and orderliness of the barracks does not equate to direct disciplinary control, nor does the fact that he was an NCO and this was known by WISNIEWSKI, IRISH and TURNER to be so, made him an agent, that is a representative of the government or put him into a governmental capacity.

The expectation of privacy of WISNIEWSKI, IRISH and TURNER was not constitutionally undermined by a government representative. For the purpose of the Fourth Amendment, the Military Rules of Evidence is of course to deter unlawful conduct by government authorities who have police powers. An unofficial, even if unlawful search by a private citizen acting on his own initiative, does not trigger Fourth Amendment rights. The resulting search warrant, seizure, obtaining contraband from Sergeant KEANE by law enforcement officials was properly or constitutionally correct.

Although the answer to question number one precludes for practical purposes answering the remaining questions, the court does find that Sergeant KEANE's peering into, entry into, and seizure of contraband was not a search and seizure protected by the Fourth Amendment, the Military Rules of Evidence. Sergeant KEANE, in his own mind at least, reasonably suspected that a crime was being committed, i.e. sale of drugs. The time was a weekend. WISNIEWSKI, IRISH and TURNER were in civilian clothes and were about to leave the room, reasonably could be expected then to leave the area, the base. There was a need to act quickly to preserve the fruits, i.e. evidence of crime.

Neither WISNIEWSKI, IRISH nor TURNER lived in the particular room in question, nor did they own the locker, nor did any of the three claim ownership of any of the items within the locker, i.e. again, contraband. Nothing was stored in the room or locker by WISNIEWSKI, IRISH, or TURNER, and of entry into the locker, however again, there was no claim of ownership nor possessory interest established for the record or claimed.

At the time of contract with Sergeant KEANE, Lance Corporal WISNIEWSKI was notified of what Sergeant KEANE had seen and knew full well of the situation. The explanation and subsequent actions were consensual. Again, as I have stated, the motion is denied.

We initially reject the government's contention both at trial and now, as well as the trial judge's finding, that Sergeant Keane was acting in a private capacity in this case. From our examination of the record, including the testimonial references by Sergeant Keane to his professional concerns as a noncommissioned officer and the "senior NCO" in the barracks to stop drug trafficking in his platoon, his previous announcement to his platoon of his intention to come down "hard" on drug involvement, statements attributed to him by a Naval Investigative Service agent regarding the fruits of his "surveillance of a room up in the barracks," and his immediate summoning of the officer of the day subsequent to his "observation" of the drug transaction and prior to his entry into the room occupied by appellant, we find that Sergeant Keane was acting in an official capacity and not as a private individual. *Cf. United States v. Thomas*, 16 U.S.C.M.A. 306, 36 C.M.R. 462 (1966); *United States v. Volante*, 4 U.S.C.M.A. 689, 16 C.M.R. 263 (1954).

The official character of Sergeant Keane's activities notwithstanding, appellant's assignment must first be examined to determine whether *appellant* is the proper person to challenge the lawfulness of the government activities in this case.

### Standing Issue

Rule 311(a) of the Military Rules of Evidence establishes the threshold issue for appellant:

Rule 311. Evidence Obtained From Unlawful Searches and Seizures

(a) *General rule.* Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if:

(1) *Objection.* The accused makes a timely motion to suppress or an objection to the evidence under this rule; and

(2) *Adequate interest.* The accused had a reasonable expectation of privacy in the person, place or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the armed forces.

Appellant certainly may call upon appropriate constitutional protections relative to his court-martial. *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). He must, however, satisfy a requirement that he enjoys a status under the law to challenge the lawfulness of the acquisition of the physical and testimonial evidence arrayed against him. That status, whether referred to as "standing," "adequate interest," or "Fourth Amendment rights" is not susceptible to easy determination. Like most criminal procedure issues, however, that determination is the essence of an appellate review process. Appellant's present contention, when reduced to its salient elements, is that as he opened Lance Corporal Lansing's wall locker in Lansing's barracks room and wrongfully distributed a quantity of an illegal drug to Irish and Turner, drugs that he had no prior property interest in, he possessed status under the umbrella of the Fourth Amendment to challenge the government's evidence of such distribution.

In determining the validity of appellant's claim of constitutional protection, we must, of necessity, determine the appropriate judicial interpretation of the amendment. The historical origins of this constitutional mantle of protection are well known. *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Colonial experiences with the "writs of assistance" used by British authorities provided adequate motivation for constitutional barriers to such governmental intrusion. *Boyd*, at 625, 6 S.Ct. at 529. It is left to the courts, however, to render the often finite decisions applying the general mandate of the amendment. *Weeks v. United States*, 232 U.S. 383, 391–92, 34 S.Ct. 341, 343–44, 58 L.Ed. 652 (1914). A recurring issue has not been whether duly appointed governmental agents may generally crash in doors, rouse sleeping citizens, and conduct wholesale searches of private dwellings in the dead of night on unfounded suspicions. That type of obvious intrusion is generally rejected by all of our citizens, and to no lesser extent by the members of our armed forces charged with the defense of the Republic. What has been a recurring and complex judicial, and for obviously different reasons, law enforcement problem, is to whom should be granted the power to challenge the lawfulness of government searches, no matter the limited and moderate nature of the intrusion?

Although this case arises in a military context, we look to federal case law for current reference points to our analysis of this issue. *United States v. Lawless*, 18 M.J. 255, 257, n. 2 (C.M.A.1984); *United States v. Foust*, 17 M.J. 85, 87 (C.M.A. 1983); *United States v. McCullough*, 14 M.J. 409, 411 (C.M.A.1983); *United States v. Miller*, 13 M.J. 75, 77 (C.M.A.1982). In the period 1978–1980, the Supreme Court

rejected the "automatic standing" rule of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and narrowed the general "standing" concept previously expressed as a "legitimately on the premises" determination. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *Rawlings, Salvucci,* and *Rakas,* taken together, represented a significant departure from the *Jones* concept that one charged with the possession of that evidence produced by government search or seizure efforts was perforce accorded "standing." Those decisions also crystallized the Court's limitation of potential assertors of Fourth Amendment protection.

■ The initial harbinger of the Court's view, *Rakas,* was an automobile search situation and arguably not applicable to the immobile environments of dwellings or barracks. *See Cardwell v. Lewis*, 417 U.S. 583, 589–91, 94 S.Ct. 2464, 2468–70, 41 L.Ed.2d 325 (1974). The decisions in *Rawlings* and *Salvucci,* however, leave little room to doubt the Court's concern with limiting Fourth Amendment protections to those persons who possess good faith, and reasonable, expectations that they are conducting their activities in a context of privacy. The focus, therefore, is not upon singular indices of property law, elements of proof related to possessory offenses, or the almost uncircumscribed reaches of "legitimately on the premises." No single "talismanic" factor is now determinative of one's right to challenge, on Fourth Amendment grounds, the lawfulness of search or seizure efforts. *United States v. Haydel,* 649 F.2d 1152, 1154 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982). The general concept which we apply, however, in determining appellant's ability to assert Fourth Amendment protections is contained in *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring): "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *See Oliver v. United States,* — U.S. —, —, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214, 223 (1984).

What, then, are the factors which may guide this determination? We find that in establishing the reasonableness of an asserted expectation of privacy, the following factors should be considered:

1. *What was the intent of the framers of the Fourth Amendment? Oliver, supra* — U.S. at —, 104 S.Ct. at 1741, 80 L.Ed.2d at 224, citing *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). *Chadwick* involved the seizure and search of a footlocker located in the open trunk of a car parked outside a train terminal. Pointing out the mobile nature of the vehicle, the government contended that the Fourth Amendment was never intended to protect items with such tenuous linkage to the accepted concept of home or dwelling. The government's view was in support of a narrow interpretation of the amendment applied only to "interests traditionally identified with the home." After examining afresh the historical experiences of the colonists with the arbitrary and generally unlimited warrants issued by British colonial authorities, the Court rejected this narrow interpretation offered by the government and found no intention by the framers to limit the protections of the amendment to areas closely embodied in a person's home or dwelling. Instead, the Court found that there had been a sufficient "manifestation," by the owners of the *double-locked footlocker,* of "an expectation that the contents would remain free from public examination." This expression of subjective reliance was, in the view of the Court, fully consonant with the purposes of the Fourth Amendment. *Id.* at 11, 97 S.Ct. at 2483.

2. *What was the nature and character of the petitioner's presence on the premises or area of the search? Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d

387 (1978). While the Court in its decision in *Rakas* was critical of the potentially broad sweep of the "legitimately on the premises" concept expressed in *Jones*, the Court found that the petitioner in *Jones* had, by the character of his presence: key to the apartment, storage of his clothing there, and one overnight stay, established a "lawful presence." *Rakas*, at 141, 99 S.Ct. at 429. The Court viewed of minor importance the "arcane" concepts of property law, *i.e.*, "guests," "invitees," "visitors." *Id.*, at 143, 99 S.Ct. at 430. What were viewed as substantial indicators of Jones' right to assert his Fourth Amendment claims were those personal linkages to the subject premises which focused clearly on the petitioner's actions and authority rather than the *nature of the property* itself. Jones' authority to be on the premises, his limited dimension and control which included the right to exclude others, and his actions taken to insure privacy were considered significant determinants of his right to claim constitutional protection from government intrusion into an apartment dwelling owned and occupied by a third party. *Rakas*, at 149, 99 S.Ct. at 433.

3. *Has our society placed sufficient value upon the specific type of area involved to justify Fourth Amendment protection?* *Oliver*, — U.S. at —, 104 S.Ct. at 1741, 80 L.Ed.2d at 224. The surviving concepts of *Jones* focus on the *petitioner's* linkages to the premises or area rather than to an analysis of the premises or area searched. *Rakas*, 439 U.S. at 141–43, 99 S.Ct. at 429–30. An analysis of the physical setting is obviously required, however, lest the reach of Fourth Amendment protections be extended beyond objectively reasonable limits. Few would contend, for example, that one who maintains full possessory and ownership "rights" to an *unlabeled*, locked, suitcase left *unattended* in a barracks recreation room or in the center of a base parade ground, could challenge, on Fourth Amendment grounds, the seizure and search of that suitcase by government agents. Proof by the owner of the suitcase that he possessed the only set of keys to the suitcase locks, that the contents

and suitcase were unquestionably his private possessions, and that he had inadvertently left the suitcase unattended, would not trigger Fourth Amendment protection. The reason for barring the constitutional protection is not related to the personal ownership or possessory rights of the petitioner to the suitcase or its contents, or the lack thereof, but to the character of the surrounding premises or area in which the unlabeled suitcase was found. The clearly public nature of recreation rooms and parade grounds represent areas over which society is not prepared to lay broad coverage of the Fourth Amendment. We can discern, however, general and historic societal beliefs that dwelling areas are accorded the maximum protection of the amendment. The amendment also reaches from the clearly constitutionally-protected dwelling areas of homes and apartments, to military barracks and field tents and across the spectrum of potential physical settings such as automobiles and those public areas which possess a proportional, imprecise, yet objectively reasonable degree of society's valuation in terms of privacy expectations. *See generally Oliver, supra,* — U.S. at — – —, 104 S.Ct. at 1741–44, 80 L.Ed.2d 224–27; *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *United States v. Mitchell,* 12 M.J. 265 (C.M.A.1982); *cf. United States v. McCormick,* 13 M.J. 900 (N.M.C.M.R.1982).

The analysis which we now apply incorporates the above factors:

Recognizing the historical intent of the Fourth Amendment, as judicially interpreted, did the petitioner, at the time Sergeant Keane peered through the venetian blind slot into room #414, have a *supportable,* subjective expectation of privacy in that room, *and* was that subjective expectation objectively reasonable in the view of society? Or, stated another way, to those government agents or officials facing similar search situations: Are we here confronted with a situation in which the individual or individuals in-

volved have taken observable steps to insure privacy over an area or location which, under the circumstances, is obviously not open to public observation or inspection or to general public access?

If the answer to either of the above delineating inquiries is "yes," then only the existence of exigent circumstances will obviate the need for a valid search authorization or clearly *voluntary* consent prior to initiating any search efforts, *if* the subsequent admissibility of the evidence is a concern. *Compare* Rule 312, Bodily Views and Intrusions; Rule 313, Inspections and Inventories; and Rule 314, Searches Not Requiring Probable Cause.

### Application To Present Case

■ We have applied the above analysis to this case and we find the trial judge erred in his denial of appellant's motion. The circumstances are easily discernible, as previously summarized in the trial record. We do not find, as the trial judge apparently did, that the lack of ownership claim to the room or its contents is determinative. We do find the following factual circumstances determinative: (1) appellant's authorized entry into, and presence in, the locked room # 414 at the instance of the assigned occupant of the room, Lance Corporal Lansing, using, at the request of Lansing, the key to that room; (2) appellant's subsequent closing and locking of the room door; (3) the lack of public view into the room because of the closed and locked door, and the drawn venetian blinds at the only window; (4) appellant's use, once inside the room with Irish and Turner, of a separate key to the lock on Lansing's wall locker, also at the insistence of Lansing and with the permission of Lansing; and (5) the obtaining from within that locker, the illegal drugs for distribution to Irish and Turner.

In consideration of these factual circumstances, we find: (1) That appellant did have a supportable, subjective expectation of privacy in room # 414 at the time Sergeant Keane peered into the room via the slot in the closed venetian blind, and (2)

That appellant's own, personal and established expectation of privacy within room # 414, was objectively reasonable in terms of societal valuation not because of general approval of drug trafficking but because of society's valuation of separate dwelling areas with closed, locked entrance doors and windows blocked from outside public view.

We recognize that we have previously distinguished military barracks from on-base and off-base quarters assigned to military personnel for the purposes of arrest authority. *McCormick, supra,* at 903–04. Here, however, we are dealing not with the existence of foundation circumstances supporting apprehension or arrest authority as in *McCormick.* Here we find the existence of sufficient societal value attached to dwelling areas, whether barracks or off-base private dwellings, to warrant the protections of the Fourth Amendment *under the factual circumstances herein presented.*

Therefore, we find that appellant did possess adequate interest in room # 414 to challenge the legality of the government search and seizure in this case. MIL.R. EVID. 311.

### Lawfulness Of Search

■ We find, contrary to the view of the trial judge, that when Sergeant Keane peered through the minute opening in the closed venetian blinds of room # 414, he conducted an unauthorized "search" of that room. *United States v. Bradshaw,* 490 F.2d 1097 (4th Cir.1974), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). We find no exigent circumstances to justify that search. MIL.R.EVID. 315(g). We further find that the subsequent entry into the room and seizure of the contraband drugs by Sergeant Keane and Staff Sergeant Lenard was an outgrowth of the unlawful search actions of Sergeant Keane, and subsequent submission in the face of authority, by appellant. MIL.R.EVID. 316. We also find that appellant's giving up of the contraband was not a consensual decision, but an acquiescence to the presence, authority, and thinly

veiled orders of his superiors. We specifically find that the government did not establish, by clear and convincing evidence, voluntary consent to search in this case. MIL.R.EVID. 314(e). *United States v. Chase*, 1 M.J. 275 (C.M.A.1976).

We therefore find the evidence which was the basis of the charges in this case was inadmissible as being the fruits of an unlawful search and seizure. MIL.R. EVID. 311.

This case is an example of the potential outcome when officers or noncommissioned officers most likely to be confronted with search and seizure situations fail to comply with the procedures dictated by the Military Rules of Evidence. There is no necessity to have a "duty" lawyer or legalman "on call" in such circumstances. Any reasonable layman could have discerned the defect in the initial report of Sergeant Keane to his platoon sergeant, Staff Sergeant Lenard, *prior* to the entry into room # 414. Sergeant Keane's observation had clearly been the result of the peeping through the venetian blind slot. There were no public or "plain view" circumstances present. Alternative procedures, however, were available. Sufficient observation of the number, type, and character of traffic to the room earlier in the day appears to have provided ample probable cause to support a request for search authorization. Certainly adequate justification was available for the platoon sergeant or Sergeant Keane to have halted anyone attempting to leave the room until a search authorization was obtained.

Instead, two apparently experienced noncommissioned officers proceeded to engage in a course of action that was both *unnecessary* and unlawful. The search procedures necessary under the rules of evidence are not so esoteric or complex that they cannot be applied by all officers and noncommissioned officers of the naval service. These procedures can be easily incorporated into all officer and noncommissioned officer professional military training schedules as they are for officer and enlisted law enforcement personnel. The training and indoctrination of personnel in authority positions in appropriate search and seizure and often related interrogation procedures is not aimed at the production of additional judge advocates, but rather the development of officers and noncommissioned officers equipped to carry out their statutory responsibilities. Evidentiary procedures rest most persuasively, not upon lofty and legalistic pronouncements, but upon basic concepts of reasonableness, fairness, and our Constitution. Failure to follow those procedures, as here, invite ultimate remedial action at the appellate level.

The findings and sentence as approved below are set aside. The findings of guilty are reversed. The record of trial is returned to the Judge Advocate General of the Navy for transmittal to the appropriate convening authority. A rehearing may be ordered.

Chief Judge EOFF and Judge RAPP concur.