UNITED STATES, Appellee,

v.

Sergeant First Class Jesus S. AYALA,
570–58–2165, United States
Army, Appellant.

CM 446711.

U.S. Army Court of Military Review.

23 June 1986.

For Appellant: John H. O'Dowd, Jr., Esquire (argued); Captain Bernard P. Ingold (on brief).

For Appellee: Captain Karen L. Taylor, JAGC (argued); Lieutenant Colonel Adrian J. Gravelle, JAGC, Lieutenant Colonel Joseph A. Rehyansky, JAGC (on brief).

Before RABY, CARMICHAEL, and ROBBLEE, Appellate Military Judges.

## OPINION OF THE COURT

RABY, Senior Judge:

Contrary to his plea, appellant was convicted of the premeditated murder of his wife, Yong Ok Ayala, in violation of Article 118, Uniform Code of Military Justice [hereinafter cited as UCMJ], 10 U.S.C. § 918 (1982). He was sentenced to a dishonorable discharge, confinement for life, forfeiture of $300.00 pay per month for life, and reduction to the grade of Private E–1. The sentence was approved by the convening authority.

## I.

### EX PARTE COMMUNICATIONS OF THE ARTICLE 32 INVESTIGATING OFFICER

■ Appellant asserts that the military judge erred in refusing to direct a new Article 32(b), UCMJ, investigation because the Investigating Officer's [hereinafter referred to as the "I.O."] *ex parte* communications with his legal adviser prejudiced appellant's right to a fair and impartial investigation.

After considering the evidence of record relevant to this issue, the legal authorities cited by counsel, and the findings of fact of the military judge, we conclude that this assignment of error is without merit.

We wish to emphasize that *ex parte* communications should be avoided whenever possible.[1] However, in the case at bar, the evidence of record, which included credible and extensive testimony by both the I.O. and the legal adviser, establishes clearly and convincingly that appellant was not

---

1. The legal adviser to the Article 32 investigating officer should not only be fair and impartial, but also should conduct his or her investigation in a manner which avoids any appearance of impropriety.

prejudiced by any of the *ex parte* communications or other erroneous acts or omissions of the I.O. and his legal adviser. Thus, we find that any operative presumption of prejudice has been overcome and that appellant's assignment of error is without merit. *United States v. Payne*, 3 M.J. 354 (C.M.A.1977); *United States v. Martel*, 19 M.J. 917, 921 (A.C.M.R.1985); *United States v. Grimm*, 6 M.J. 890 (A.C. M.R.), *pet. denied*, 7 M.J. 135 (C.M.A.1979); *see United States v. Crumb*, 10 M.J. 520, 528 (A.C.M.R.1980) (concurring opinion, Jones, J.).

## II.

### CID COMMANDER AS A GOVERNMENT REPRESENTATIVE AT TRIAL

■ Appellant asserts that the military judge erred in denying the defense's request to exclude Major W, the commander of the local Criminal Investigation Command office [hereinafter referred to as CID], from functioning as a government representative at trial. Specifically, the government, relying on Military Rule of Evidence [hereinafter cited as MRE] 615, appointed Major W as a government representative and allowed him to sit at its counsel table.[2] The defense made a timely objection, and argued that to allow Major W to sit as a government representative, and thus preview evidence centering on his conduct in administering this criminal investigation, would deny the accused due process of law.

Military Rule of Evidence 615 pertinently provides:

At the request of the prosecution or defense the military judge shall order witnesses excluded so that they cannot hear the testimony of other witnesses.... This rule does not authorize exclusion of ... (2) a member of an armed service ... designated as representative of the United States by the trial counsel....

The Analysis to MRE 615, contained in the Manual for Courts-Martial, United States, 1984 [hereinafter cited as MCM or Manual], Appendix 22, states that:

Rule 615 is taken from the Federal Rule with only minor changes of terminology.... The second portion, consisting of subdivisions (2) and (3), represents a substantial departure from current practice and will authorize the prosecution to designate another individual to sit with the trial counsel.... Under the Rule, the military judge *lacks any discretion to exclude potential witnesses* who come within the scope of Rule 615(2) and (3) *unless the accused's constitutional right to a fair trial would be violated.* Developing Article III practice recognizes the defense right, upon request, to have a prosecution witness, not excluded because of Rule 615, testify before other prosecution witnesses.

(Emphasis added.)

We do not condone the practice used by the government in this case because such a practice might, in certain circumstances, infringe upon an appellant's due process rights and become a source of possible appellate litigation. Nevertheless, it is clear that MRE 615 is broad enough in scope to allow the government's appointment of Major W as a government representative even though he was to be called as a witness. Ample precedent exists for the designation of a government criminal investigative agent as the government's representative at trial even though that agent also is a government witness. *United States v. Jones*, 687 F.2d 1265, 1267–1268 (8th Cir.1982); *United States v. Perry*, 643 F.2d 38, 53 (2d Cir.), *cert. denied sub nom Patterson v. United States*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *In re United States*, 584 F.2d 666, 667 (5th Cir.1978); *United States v. Wells*, 437 F.2d 1144, 1146 (6th Cir.1971); *Powell v. United States*, 208 F.2d 618, 619 (6th Cir.1953), *cert. denied*, 347 U.S. 961, 74 S.Ct. 710, 98 L.Ed. 1104 (1954); *see United*

---

**2.** Major W actively participated in the criminal investigation of this case and was clearly a potential government witness at the time of his designation as government representative.

*States v. Garafolo,* 385 F.2d 200, 207 (7th Cir.1967), *vacated and remanded on other grounds,* 390 U.S. 144, 88 S.Ct. 841, 19 L.Ed.2d 970 (1968). We believe that MRE 615 authorizes a similar procedure in courts-martial.

In this instance, Major W testified as the first government witness before any significant legal argument was presented in open court concerning the suppression motions. He was subject to thorough cross-examination. Subsequently, after other witnesses testified, Major W was recalled twice to testify and each time the defense was given the opportunity to cross-examine him. Such a procedure, that is, the government's recall of Major W after other witnesses had testified, is not error *per se.* *United States v. Butera,* 677 F.2d 1376, 1381 (11th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); *cf. United States v. Scott,* 13 M.J. 874, 877 (N.M.C.M. R.1982) (no abuse of discretion in denying request that government representative testify first, especially since agent's testimony was not offered to corroborate testimony of prior witnesses and was not of a nature that the agent could have formulated his responses based on the prior testimony), *aff'd on remand,* 17 M.J. 724 (N.M.C. M.R.1983), *pet. granted on other grounds,* 18 M.J. 131 (C.M.A.1984).

We carefully have examined the record of trial and are convinced that in this case, especially since Major W was called as the government's first witness and was subjected to extensive direct examination, cross-examination, and examination by the military judge, that Major W's testimony upon his several recalls to the stand was not fabricated or in any manner altered by his observation of other witnesses. Further, we are satisfied that appellant neither has shown specific prejudice, Article 59(a),

UCMJ, 10 U.S.C. § 859(a) (1982), nor has he demonstrated to this court's satisfaction any denial of military due process or the violation of any constitutional right by virtue of the procedure used by the government.

Accordingly, we find the assignment of error is without merit.

### III.

### SEARCH OF APPELLANT'S ON–POST FAMILY QUARTERS

Appellant asserts that the military judge erred in refusing to suppress the evidence obtained from the unwarranted entry into appellant's on-post family quarters.

#### a. The Facts

On or about 8 June 1984, the battered body of an unidentified oriental female was discovered in a trunk on the side of a road near Pueblo, Colorado, approximately forty miles from Colorado Springs and Fort Carson, Colorado. Because of the body's condition and the lack of any identification, the local police were unable to make an immediate identification of the deceased, Yong Ok Ayala. The finding of the body was well publicized by the local news media.

On Saturday, 7 July 1984, a neighbor of appellant's, who also was a friend of the deceased, informed the post CID that she suspected that the unidentified body was that of Mrs. Ayala. She later identified the body as that of Mrs. Ayala.[3]

Subsequently, the local CID Chief, Major W, was informed by his agents of these new developments. Major W was told that appellant was in residence at the Ivy Inn and "out of the government quarters", and that appellant was awaiting approval of his recently requested retirement date.

Based on information that he had received from his agents, Major W believed

---

**3.** One of the unique physical features of Mrs. Ayala's body which facilitated her identification was that an implant from a former breast augmentation operation had been surgically removed from one breast. This fact was known to the CID at the time of the search, together with information that one of Mrs. Ayala's neighbors had seen Mrs. Ayala entering her quarters the night before she disappeared. Mrs. Ayala

was not seen alive again and did not meet with this neighbor for coffee the next morning as planned. The CID also had received information that appellant and his wife fought frequently; and, that appellant had informed the same neighbor that Mrs. Ayala had gone to Korea to visit her family, but later stated that she had gone to California to visit a brother.

that appellant had cleared his assigned family quarters,[4] and that he "had released those quarters" to the government.[5] Major W also was informed that the moving van already had arrived at the quarters and that appellant was moved out. Major W contacted Mr. K, Chief of Housing, to verify the status of appellant's quarters. Mr. K told Major W that it appeared from existing records that appellant had cleared his quarters, but that he could not personally substantiate this fact. Mr. K suggested to Major W that the quarters clearance personnel in his office[6] could best answer whether the quarters were cleared.

Major W subsequently called the judge advocate on-call officer, Captain Kn, for advice. Although some discrepancies exist between the recollections of these two officers, we are convinced that Captain Kn did inform Major W that "if the quarters had been cleared that [the CID] could search the quarters because there was ... no expectation of privacy once the quarters had been cleared. That [they were] government quarters and a government agent could enter the area." However, Captain Kn also advised Major W that a search authorization should be obtained.

Thereafter, Major W, at least one CID agent, and two civilian detectives entered appellant's quarters.[7] Upon entry, Major W observed that all of the furniture had been removed from the quarters; however, in the kitchen, some cleaning supplies were found, the stove was pulled away from the wall, and the refrigerator door was open.[8]

Realizing from the disarray of the kitchen that appellant could not have cleared his quarters, Major W immediately departed the quarters and obtained a search authorization.[9] Although the rest of the CID team remained in the quarters and continued the search, we find that they found and seized no evidence until after Major W returned with the search authorization. After Major W returned, the team continued its search and found stains, which appeared to be blood stains, on a hallway door, on a floor molding, and in the laundry room.

On 11 July 1984, a large amount of blood evidence was found in the child's bedroom by trained laboratory personnel. Appellant's quarters had been sealed off by the CID on July 7th and no unauthorized personnel had access to the quarters thereafter.

### b. Appellant's Interest In The Family Quarters

In resolving issues concerning the search of appellant's family quarters, the military

---

**4.** Once a soldier clears quarters, he relinquishes to the government all possessory interest that he had in those quarters.

**5.** In resolving issues concerning Major W's good faith during the course of this investigation, we note that "[m]ilitary officers are public officers and, as such, it ... is presumed that they perform their official duties in a regular manner and in good faith, as well as in compliance with the law." *United States v. Martinez*, 19 M.J. 744, 751 (A.C.M.R.1984), *pet. denied*, 21 M.J. 27 (C.M.A.1985). *See also, Wilkes v. Dinsman*, 48 U.S. (7 How.) 89, 12 L.Ed. 618 (1849).

**6.** These people were not available since this meeting occurred on a Saturday afternoon when the Housing Office was closed.

**7.** We find that at the time of this team's physical entry, all participating law enforcement personnel believed in good faith that appellant previously had cleared his family quarters.

**8.** We find that at the time the CID team entered appellant's quarters, all of appellant's personal property had been removed therefrom, except for minor items which appellant either had abandoned or left for the use of the quarters cleaning team he had hired. Further, the cleaning team already had commenced cleaning before the CID team entered the premises.

**9.** The military judge found, and we agree, that this search authorization issued by the installation commander was not based on probable cause. We are convinced, however, that Major W was not aware of this fact and that he subsequently relied on the authorization in good faith. *See generally, United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 *rehearing denied*, 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984); *but cf., United States v. Johnson*, 21 M.J. 553, 555 (A.F.C.M.R.1985) ("We find the 'good faith' exception does not apply to trials by courts-martial governed by the Military Rules of Evidence...."), *cert. for review filed*, 21 M.J. 300 (C.M.A.1985) (the *Leon* issue is included in this certification).

judge made several findings. Among these were the findings that appellant: (1) at the time of the initial CID entry had not abandoned his quarters; (2) had no expectation of privacy in his empty government quarters from which he had, basically, removed himself and his belongings; (3) had given one of his quarters keys to a "neutral cleaning lady who was not a friend...."; (4) could not reasonably expect that anything he left in the quarters would not be turned over to the authorities by the cleaning lady; and (5) no longer lived in the quarters at the time of the initial CID entry.

We find that at the time of the initial entry, appellant had moved out of his family quarters; that he had removed all personal property therefrom except that which he had abandoned or left for the cleaning lady; and that he was no longer using the premises for their intended purpose as a place of residence.

However, appellant had neither abandoned nor cleared these quarters.[10] Thus, he retained a rudimentary possessory interest therein.[11]

### c. Resolution

#### (1) Probable Cause

Considering the totality of the relevant evidence concerning the search of appellant's quarters, we are convinced that probable cause for the search did not exist at the time of the CID agents' initial entry into appellant's assigned family quarters.

#### (2) Threshold Basis

■ In order to have a legitimate threshold basis [hereinafter referred to as "standing"] to challenge an alleged unlaw-

ful search, an accused must have enjoyed "a reasonable expectation of privacy" in the place or property searched.[12] MRE 311(a)(2); *accord United States v. Portt,* 21 M.J. 333, 334 (C.M.A.1986); *see also United States v. Harris,* 5 M.J. 44, 46 (C.M.A.1978), *citing, United States v. Nunn,* 525 F.2d 958, 959 (5th Cir.1976). Such "standing" no longer is automatic where possession of the challenged evidence is not an essential element of the offense. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Harris,* 5 M.J. at 44.

■ We recognize that "members of the armed forces cannot and do not enjoy the same rights of privacy as do the civilian elements of our society." *United States v. Thomas,* 21 M.J. 928, 932 (A.C.M.R.1986). Nevertheless, within so-called "family housing" quarters and other military facilities authorized for use as places of temporary residence for service member dependents or non-military guests, we believe that persons lawfully residing therein generally are vested with "a reasonable expectation of privacy" within the meaning of MRE 311(a)(2).

■ It is apparent from the facts of this case that appellant still possessed an interest in the quarters since he had not "cleared" them as required by applicable regulation. But, it is equally clear that appellant also had voluntarily relinquished any right to use the quarters as a residence before the time they initially were entered and searched by CID agents.

We are convinced, after considering all of the relevant factors[13] in this case, that

---

**10.** In view of existing Army regulations, we seriously doubt that any soldier can unilaterally abandon his assigned government quarters. He can only relinquish his possessory interest therein in the manner prescribed by regulation. *See generally,* Army Regulation 210–50, Installations: Family Housing Management (1 Feb. 1982).

**11.** Compare the facts of this case with the differing facts of *State v. Johnson,* 716 P.2d 1288 (Idaho 1986) (police should have known from personal items found inside the premises that

tenant still enjoyed a reasonable expectation of privacy in the rented property, even though landlord told police that tenant had moved).

**12.** Continued use of the term "standing" currently is of questionable validity. *See United States v. Salvucci,* 448 U.S. 83, 87 n. 4, 100 S.Ct. 2547, 2551 n. 4, 65 L.Ed.2d 619 (1980); MCM, Appendix 22, Analysis to MRE 311(a)(2).

**13.** Property rights are only one factor to be considered in determining whether appellant has "standing" to contest the search of his as-

appellant's "reasonable expectation of privacy" in the quarters had been so diminished as to divest him of any "standing" to object to the search of these premises. At the time of the CID agents' initial entry into the premises, appellant was no longer making personal use of the quarters as his residence; he was not keeping any furniture or other personal property in the quarters; he had taken residence at the Ivy Inn, and he had given a door key and authorization to enter the quarters to a contract cleaner.[14]

■ Suppression of evidence "can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965–966, 22 L.Ed.2d 176 (1969). The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate (that is, a reasonable) expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Thus, unless the appellant can demonstrate a reasonable expectation of privacy in the place searched, his mere possessory interest in the searched government quarters will not establish a Fourth Amendment violation. *See United States v. Salvucci*, 448 U.S. at 91–92, 100 S.Ct. at 2552–2553; *United States v. Quinn*, —— U.S. ——, 106 S.Ct. 1623, 89 L.Ed.2d 803 (1986) (per curiam decision dismissing writ of certiorari as improvidently granted); *Rawlings v. Kentucky*, 448 U.S. 98, 105–106, 100 S.Ct. 2556, 2561–2562, 65 L.Ed.2d 633 (1980); *United States v. Miller*, 13 M.J. 75, 77 (C.M.A.1982) (person seeking to suppress search evidence bears burden of proving he had a legitimate expectation of privacy in area being searched); *cf. United States v. Harris*, 5 M.J. at 46–47 (recognizing that actual standing by virtue of a reasonable expectation of privacy *may* be established, in certain circumstances, by a proprietory interest in premises seized).

■ The test for determining whether appellant has demonstrated a reasonable expectation of privacy is twofold. First, appellant must have exhibited an actual (subjective) expectation of privacy and, second, the expectation must be one that society is prepared to recognize as objectively reasonable. *California v. Ciraolo*, —— U.S. ——, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan J., concurring); *United States v. Portt*, 21 M.J. 333, 334–335 (C.M.A.1986); *State v. Biggar*, 716 P.2d 493 (Hawaii 1986).

Appellant has the burden of establishing that he had a reasonable expectation of privacy in the area being searched. *United States v. Miller*, 13 M.J. 75, 77 (C.M.A. 1982).

Appellant asserts that he exhibited and attempted to preserve a subjective expectation of privacy by locking the quarters door. We disagree. Our review of the trial record discloses only that the CID agents found appellant's quarters locked,

---

signed government-owned quarters. *See United States v. Salvucci*, 448 U.S. at 91–92, 100 S.Ct. at 2552–2553.

**14.** Although "family housing" units are places in which individuals normally can enjoy a "reasonable expectation of privacy," their expectation is not of the same level of privacy that a civilian enjoys when residing in a rented apartment. An installation commander remains responsible for the proper and safe use of government quarters and government furnishings located on his installation. In this regard, he has certain powers in excess of those that most civilian landlords enjoy. Thus, for example, to preclude anti-deficiency act violations from occurring when utility funding is critical, an installation commander can direct that heating/air conditioning thermostat settings not exceed certain levels, and can authorize staff personnel to inspect for compliance. The level of privacy which reasonably can be expected in quarters in the process of being "cleared" obviously is even more diminished. We have no doubt that all military personnel who are assigned family housing are aware that administrative inspections are an inherent aspect of the quarters clearance process.

and opened the door with a master key obtained from the military police.[15] The record does not reflect that appellant locked the door to his quarters. Rather, the record establishes that appellant gave a quarters key to a cleaning lady; that two cleaning ladies were present in the quarters on Saturday morning, 7 July 1984, when Specialist D was helping appellant with some final pre-cleaning chores; that "the actual cleaning" which was done was accomplished after the quarters were empty; and that at least one cleaning lady, Mrs. L, returned on Sunday, 8 July 1984, to clean but found that the quarters had been secured by the CID. From these facts, we find that appellant's quarters were locked on Saturday before the CID agents' entry therein by the contract cleaning team, and not by appellant. Even if appellant had locked the quarters, however, considering the totality of the relevant evidence, we find that he could not reasonably have harbored a subjective expectation of privacy in these premises. Further, we do not believe that society is prepared to recognize such an expectation when a soldier has moved all of his personal belongings from the government quarters located on a military installation, has completed his own pre-clearing chores in those quarters, has retained a contract cleaning team, has provided that team with a means of access to the quarters, has left the team in those quarters to clean them after they were empty, and has taken up temporary residence in another building on the military installation.

Accordingly, we find this assignment of error to be without merit.

### (3) Inevitable Discovery

In view of our determination of appellant's lack of "standing" to challenge the alleged unlawful search of his assigned government quarters, we need not resolve the issue of inevitable discovery. *See generally, Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United*

*States v. Kozak,* 12 M.J. 389 (C.M.A.1982); *United States v. Carrubba,* 19 M.J. 896 (A.C.M.R.1985); *United States v. Anderson,* 21 M.J. 751 (N.M.C.M.R.1985). Accordingly, we need not determine whether the inevitable discovery analysis should focus on the independence and inevitability of the lawful means of discovery, or should include the so-called "active pursuit" test which requires a showing that the lawful means by which the evidence would have been inevitably discovered was in progress at the time the evidence was found. *Compare United States v. Silvestri,* 787 F.2d 736 (1st Cir.1986), *and United States v. Merriweather,* 777 F.2d 503 (9th Cir.1985), *with United States v. Cherry,* 759 F.2d 1196 (5th Cir.1985), *and United States v. Satterfield,* 743 F.2d 827 (11th Cir.1984), *and United States v. Romero,* 692 F.2d 699 (10th Cir.1982).

However, mindful of our responsibilities as an intermediate appellate court and of our statutory fact finding power, we will at this time resolve certain controverted questions of fact relevant to this legal issue.

In addition to the findings of fact previously made herein, we find that: (1) it was the intent of the law enforcement personnel to search appellant's quarters for blood stains and other evidence of homicide at the time of their entry into the premises; and, if their subsequent request for a search authorization had been denied, they would have renewed their search efforts as soon as appellant had, in fact, "cleared" the quarters; (2) prior to the law enforcement agents' initial entry into appellant's quarters, on Saturday, 7 July 1984, appellant had attempted to clean the blood spatters and stains; (3) appellant's efforts to remove all blood spatters and stains from the quarters were ineffective; (4) at the time of the law enforcement officers' initial entry into the quarters, appellant had completed his attempts to clean the blood spatters and stains; (5) the contract cleaning

---

**15.** It is a matter of common knowledge to Army personnel that on a military installation master keys are available to open government buildings, including family quarters. These keys are available for official use by such persons as military law-enforcement personnel, post engineers, housing personnel, and by building occupants who have lost or misplaced their keys.

team (Mrs. L) had not washed any walls at the time the law enforcement agents entered the quarters on Saturday; (6) the contract cleaning team had completed its cleaning of the two bathrooms, the laundry room and the utility room in the quarters, which did not include washing the walls in these rooms; (7) the cleaning team noticed no unusual stains or dirt in the quarters; (8) the contract cleaning team could not finish the cleaning of the quarters on Sunday, or thereafter, because the CID had secured the quarters; (9) the blood stains found in the previously cleaned utility room had not been washed; and, (10) the blood spatters or stains found on appellant's furniture and other household goods had not been washed.

From the testimony of record and the above facts, we also infer that: (1) the contract cleaning team would not have washed any of the walls or the ceiling of appellant's quarters;[16] and (2) even if the CID agents had not entered appellant's quarters until after the quarters had been returned to exclusive government control ("cleared"), the blood spatter and stain evidence ultimately would have been found.

## IV.

## ALLEGED APPREHENSION OF APPELLANT AT THE IVY INN AND THE ADMISSION OF EVIDENCE OBTAINED THEREAFTER

Appellant asserts that "the military judge erred in refusing to suppress evidence . . . obtained as a result of the unlawful . . . entry (of) appellant's temporary quarters at the 'Ivy Inn' and resulting from the illegal . . . apprehension of appellant."

### a. The Relevant Facts

After discovering what appeared to be blood spatters or stains on a door leading to the laundry room, in a storage room adjacent to the laundry room, and in the laundry room of appellant's quarters, Major W, Special Agent D, and Detective B proceeded to the Ivy Inn[17] where appellant temporarily was residing. They arrived at the Ivy Inn at about 2010 hours, Saturday evening. Their intent was to question appellant about his missing wife and to apprehend him if he did not provide a suitable explanation.

Before going to the Ivy Inn, Major W again contacted Captain Kn, the judge advocate on-call officer, who advised Major W of the requirement for probable cause to apprehend. He informed Major W that he [Major W] "had quite a bit of evidence" from which Major W could conclude that he had probable cause to apprehend appellant, and opined that "there [is] no requirement for an arrest warrant in the military."

Upon arriving at the Ivy Inn, seeing appellant's car parked outside, and ascertaining from a desk clerk that appellant was "registered in the room" and had not been seen coming out, Major W and the two other investigators proceeded to appellant's room and knocked on the door. When appellant did not answer, the investigators continued knocking on his door. They knocked at least on eight or nine separate occasions and they knocked at least five or six times during each interval. The knocks were loud enough to wake up anyone sleeping inside the room, and caused several other people further down the hallway to open their doors. At some point when appellant did not respond to the loud knock-

16. Incidentally, the relevant testimony of the cleaning lady concerning her cleaning activities in appellant's quarters and this finding of fact both are consistent with our years of military experience concerning normal quarters clearance practices.

17. The Ivy Inn is an on-post government facility "designated as a Visiting Officers Quarters (VOQ), Visiting Enlisted Quarters (VEQ) and Distinguished Visitors Quarters (DVQ)." Distinguished Visitors Quarters can be "established to

provide hotel-or-motel type accommodations...." Visiting civilian contractor personnel can obtain rooms on a confirmed basis. The Ivy Inn also allowed PCS [permanent change of station] families and retirees and their dependents to have rooms on a space available basis. Moreover, some dependents, such as Mrs. S, apparently were allowed to stay unaccompanied in the Ivy Inn for a period of time after their military spouses were assigned and had reported to overseas units.

ing, Major W went outside and observed that a light and a television set appeared to be on in appellant's room.

When it appeared that appellant would not respond to the knocking, and believing appellant was in the room, Major W again called Captain Kn and informed him of what was transpiring. Captain Kn advised Major W "to contact the desk manager" to obtain a pass key to enter the room. However, Captain Kn did admonish Major W that if "they desired to search the . . . room at the Ivy Inn, that they would have to obtain independent search authorization to do that."

After receiving this advice, the investigators obtained a pass key, and Special Agent D opened appellant's door. The investigators did not physically enter the room, but looked into it from their position in the common hallway. The appellant was observed lying on his bed, naked except for his socks. He appeared either to be asleep or unconscious. No movement of appellant's chest or stomach was observed. The appellant was called by name several times but he did not respond. Major W thought appellant might be intoxicated or might have overdosed on drugs; however, no alcohol or drugs were in view. At this point, the investigators, being concerned about appellant's "medical health", physically entered the room.[18]

Special Agent D walked over to the bed to see if appellant was breathing; he shook the bed and called appellant's name several times. Appellant opened his eyes, looked at the agent and closed his eyes again. Special Agent D was concerned that appel-

lant had overdosed on alcohol or some other type of drug, as his response did not appear "to be a normal reaction."[19]

Major W promptly called the military police and asked them to send a patrol and paramedics to the Ivy Inn. He then called Captain Kn and informed him of the situation. Captain Kn, apparently independently, advised Major W to call for medical assistance.

The paramedics entered appellant's room and set a medical bag on the floor. One of the medics apparently yelled at appellant, who immediately awoke. Appellant appeared to be surprised, but he did not appear intoxicated. After observing appellant and detecting no medical impairment, the paramedics departed. Special Agent D then asked appellant if he "would put [his] clothes on, and accompany [the agents] to the [CID] office" for questioning. Appellant was not told that he was under apprehension nor was he handcuffed, although he would not have been free to refuse to accompany the agents at that point in time. Appellant was transported to the CID office in Major W's vehicle and taken to the second floor of the CID building where he was placed in Special Agent D's office.[20]

Appellant was advised of his *Article 31/Tempia*[21] rights, which he waived. He then made several oral admissions to Special Agent D.

Appellant thereafter consented to the search of his person, his quarters, and his vehicle, and to the household goods and personal property that had been picked up from his quarters by a commercial moving company. This consent was made in writ-

---

**18.** At no time did the investigators announce who they were prior to entering appellant's room.

**19.** Appellant "looked up and saw [Special Agent D] in his hotel room and didn't question [the agent] being there, not knowing who [the agent] was."

**20.** Special Agent D's office was 10′ × 10′ with one window (without bars) and two doors. Only about 15 minutes elapsed from the time appellant awoke until he was advised of his rights in the CID office. The only question

which appellant asked on the way to the CID office was whether "this was about the disappearance of his wife." The agents declined to discuss the matter until they were at the CID office. Appellant was allowed to smoke and to go unescorted down the second floor hall to obtain coffee. The record reflects that appellant was not subjected to any form of unlawful inducement, coercion, or influence at anytime during the interrogation process.

**21.** Article 31, UCMJ, 10 U.S.C. § 831 (1982); *United States v. Tempia*, 37 C.M.R. 249 (C.M.A. 1967).

ing after appellant had been expressly advised of his right to refuse to consent to these searches.[22]

Shortly after consenting to the search, appellant terminated the interview by requesting an attorney.

Subsequently, the CID obtained a commander's authorization to search appellant's car and a civilian search warrant to search appellant's household goods which had been transported from his quarters to a civilian storage facility in Kansas. The CID searched the car and the household goods in the storage facility, and discovered blood-spattered items belonging to appellant at both locations.

b. Military Judge's Findings

The military judge made certain specific findings concerning the investigators' initial opening of the door to appellant's room, as well as concerning their entry into the room and their apprehension of appellant. Included therein were the findings that: (1) the individuals in the hallway knocked loudly enough to awaken anybody sleeping in appellant's room; (2) people have a right to refuse to answer their doors; (3) in a transient facility it is reasonable to expect that if you refuse to answer a knock at your door, someone, such as a maid, maintenance man or manager, may open the door anyway; (4) the appellant, and any person so situated, "lacks standing to have any reasonable expectation of privacy with respect to a room similar to a motel room simply from having the door opened and having someone look in....";

(5) the investigators' entry into appellant's room was precipitated by their desire to ascertain whether appellant needed medical attention and render it if needed; (6) Major W had probable cause to apprehend appellant; (7) the investigators believed that the reddish or brownish stains previously found by them in appellant's family quarters were blood; and, (8) appellant was placed under apprehension in his quarters, although not informed of that fact by the agents.

Except for findings (3) and (4), we agree with the foregoing findings of the military judge. However, for reasons hereinafter discussed, we decline to uphold findings (3) and (4).[23]

c. The Resolution

(1) Ivy Inn Entry

Considering the totality of the facts, we find that although the investigative agents had probable cause to apprehend appellant at the Ivy Inn,[24] they lacked authorization from the installation commander to enter appellant's room in order to apprehend him.

As early as 1976, this court held that "absent exigent circumstances, appropriate authorization by a responsible commander based upon probable cause must be obtained before a *private dwelling* may be entered to make an arrest even though the person entering possesses authority to arrest and has probable cause to do so." (Emphasis added.) *United States v. Jamison*, 2 M.J. 906 (A.C.M.R.1976). The *Jamison* opinion was considered "compellingly

22. Appellant was not informed of the prior search of his quarters until after his written consent to search had been obtained.

23. We find no evidence in the trial record concerning the policies and practices of the Ivy Inn in employing maids and maintenance personnel, or of the procedures used by such persons in gaining access to a guest's room within that facility. Moreover, we do not believe that the speculations of the trial judge concerning such matters are sufficient, especially, as in this case, where the provisions of MRE 201 (Judicial Notice of Adjudicative Facts) are not adequately met. We are well aware of the widely differing policies adopted by various military visitor facilities and civilian hotel/motel facilities concern-

ing such matters, and do not choose to guess what the practice might have been at the Ivy Inn, or whether appellant knew or reasonably should have known of that practice on the day in question.

24. We believe that the blood stains found earlier in the day at appellant's quarters, coupled with the prior information known to the agents, provided probable cause for appellant's apprehension; and, that the location of appellant's car, coupled with the information supplied by the desk clerk and the sound and light coming from appellant's room, provided the agents with reasonable grounds to believe appellant was, in fact, in his room when they opened his door.

persuasive" by the United States Court of Military Appeals in *United States v. Davis*, 8 M.J. 79 (C.M.A.1979) (summary disposition).

The United States Supreme Court previously has held that the protection of the Fourth Amendment did not preclude a warrantless arrest based upon probable cause which was accomplished midday and in public. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Nevertheless, in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Court expressed its concern with protecting individuals against unreasonable intrusions into their privacy by holding that the police violated the Fourth Amendment when, without probable cause, they seized petitioner and transported him to the police station for interrogation. *Id.* at 216, 99 S.Ct. at 2258. One year later, in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Court opined that absent exigent circumstances, the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make an arrest.[25] Although the results of these cases differ in view of their clearly distinguishable facts, the touchstone underpinning each is the Court's express or implied recognition that "violations of privacy" are the "chief evil that the Fourth Amendment was designed to deter", and "that any governmental intrusion into an individual's home *or expectation of privacy* must be strictly circumscribed." (Emphasis added.) *See e.g., Payton v. New York*, 445 U.S. at 582 n. 17, 100 S.Ct. at 1377 n. 17.

█ Clearly, the Fourth Amendment protections recognized in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, apply to members of the military. *See generally, United States v. Mitchell*, 12 M.J. 265, 269 (C.M.A.1982); *United States v. Hays*, 16 M.J. 636, 637 (A.F.C.M.R.1983); *United States v. Baker*, 14 M.J. 602, 605 (A.F.C.M.R.1982); *United States v. McCormick*, 13

M.J. 900, 904 (N.M.C.M.R.), *pet. denied*, 14 M.J. 289 (C.M.A.1982); RCM 302(e). However, the *Payton* rule would appear to be limited in its military application to circumstances where the service member's apprehension occurs within a "private dwelling or residence". *See United States v. McCormick*, 13 M.J. at 903; *United States v. Mitchell*, 12 M.J. at 269; *see also United States v. Baker*, 14 M.J. at 605; *United States v. Hays*, 16 M.J. at 637. Certainly, no requirement currently exists under the Fourth Amendment that military law enforcement officers obtain search warrants or other authorization from a commander or a magistrate before effectuating a probable cause apprehension in a public place. *United States v. Tipton*, 16 M.J. 283, 285 (C.M.A.1983), *citing United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976) and *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Thus, for example, a search warrant or other search or arrest authorization is not required in order to effect lawfully a probable cause apprehension of a service member in a barracks hallway, a military vehicle, a field tent, a bunker, or a similar public place. *See generally, United States v. Tipton*, 16 M.J. at 285; *United States v. McCormick*, 13 M.J. 900; RCM 302(e); *see also United States v. Baker*, 14 M.J. 602.

█ Accordingly, we initially must determine whether appellant's Ivy Inn room should be generally categorized as a "private residence" or as a "public place". Although the record contains only minimal evidence regarding the physical structure, management policies, and daily operating procedures of the Ivy Inn, we conclude from the totality of the available evidence that the Ivy Inn is not a barracks and is not operated as such. Rather, we find that notwithstanding its technical classification, the Ivy Inn, in fact, was being operated in a manner more closely analogous to a military guest house. That is, its operating

---

**25.** The police had probable cause to arrest Theodore Payton; however, they entered his *apartment* without an arrest warrant.

procedures encompassed certain methods of business generally associated with civilian hotel/motel management. It is settled that a hotel or motel guest is entitled to constitutional protection against unreasonable searches and seizures. *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Owens,* 782 F.2d 146 (10th Cir.1986); *see United States v. Hillan,* 26 C.M.R. 771, 787 (N.C.M.R.1958); *cf.; United States v. Hines,* 5 M.J. 916, 919 (A.C.M.R.1978) (discussing the reasonable expectation of privacy an officer enjoys in his BOQ room). That protection would disappear rapidly if the guests' rooms in such facilities were considered to be public rather than private in character.

■ We reject any notion that appellant relinquished his reasonable expectation of privacy in his room at the Ivy Inn when he failed to respond to the knocks on his door. In fact, failing to answer a knock on the door is one way in which many members of the public preserve their privacy within their private dwellings. Assuming *arguendo,* even in the absence of any evidence concerning the room-entry procedures used by any maids or maintenance personnel at the Ivy Inn, that appellant gave " 'implied or express permission' to 'such persons as maids, janitors or repairmen' to enter his room 'in the performance of their duties,' " the conduct of the law enforcement agents in this case "was of an entirely different order." *See Stoner v. California,* 376 U.S. at 489, 84 S.Ct. at 893; *United States v. Jeffers,* 342 U.S. 48, 51–52, 72 S.Ct. 93, 95–96, 96 L.Ed. 59 (1951). Any such conditional right of entry should not automatically be extended to the police, unless society and its courts are willing to substitute a "mere maid" rule for Fourth Amendment

privacy protection whenever one checks-in at such facilities. We find this type of proposition unacceptable.

■ We believe that when the law enforcement agents opened appellant's door they effected an entry, *albeit* not a physical entry, of the room within the meaning of *Payton. Cf. Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Fourth Amendment violated by attaching electronic equipment to outside of a phone booth even though device used did not penetrate wall of booth). The investigators' action clearly infringed on appellant's privacy, as it exposed appellant's naked body to their view and to the view of any other person in the public corridor who by happenstance should walk by at that moment.[26]

All factors considered, we are convinced that appellant exhibited a subjective expectation of privacy within his Ivy Inn room; and, that society is prepared to and does recognize as objectively reasonable a soldier's expectation of privacy in his on-post motel/hotel-type accommodations, such as the Ivy Inn. We believe this especially to be true where the facilities' guests lawfully may include military dependents and other civilians.

The government argues that the entry into appellant's quarters was based on exigent circumstances. We find that the facts do not establish that such an exigency existed when appellant's door was *opened* and his privacy was invaded.[27] Thus, an exigency exception to the *Payton* rule cannot be sustained. However, we are equally convinced that a medical exigency did arise moments later and before the investigators *physically entered* the room. The effect of this exigency will be discussed below.

---

**26.** We note that in championing "knock and announce and daytime [entry] requirements", the dissent in *Payton* stated: "The ... requirements protect individuals against the fear, humiliation, and embarrassment of being roused from their beds in states of partial or complete undress." *Payton v. New York,* 445 U.S. at 617, 100 S.Ct. at 1395 (White, J., dissenting). Thus, we are satisfied that the investigator's conduct

at the Ivy Inn spawned a type of privacy invasion to which the Supreme Court is sensitive.

**27.** The exigent circumstances doctrine applies only when the inevitable delay incident to obtaining an arrest authorization or (search) warrant must give way to the need for immediate action. *See United States v. Satterfield,* 743 F.2d 827, 844 (11th Cir.1984).

Based on all the foregoing matters discussed, we find that the investigators' opening of appellant's door violated appellant's Fourth Amendment rights, as those rights have been delineated in *Payton*.

## (2) The Effect Of The *Payton* Violation

The constitutional principle which underpins both *Payton* and *Dunaway* is the Fourth Amendment protection of a citizen's reasonable expectation of privacy. As members of the Armed Forces cannot and do not enjoy the same rights to privacy as do members of our civilian society, *United States v. Thomas*, 21 M.J. at 932, we must carefully determine what effect should be given to a *Payton* violation which occurs in an on-post private dwelling or in other on-post facilities being used as private residences.

. Shortly after his illegal apprehension, appellant was taken to the CID office where he was properly warned of his *Article 31/Tempia* rights, which he voluntarily waived. Subsequently, appellant made certain admissions to the investigators and consented to various searches. We are convinced that this action satisfied existing Fifth Amendment procedural requirements, and thus met the "threshold requirement" for Fourth Amendment analysis. *See Dunaway v. New York*, 442 U.S. at 217, 99 S.Ct. at 2259, *citing Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

■ We believe that in the military, a *Payton* violation should not result in automatic case reversal. Such a policy would not substantially deter investigative misconduct and would serve to undermine the interests of justice and judicial integrity.[28] Rather, we believe that a service member's Fourth Amendment right of privacy, as well as public's interest in the just and lawful disposition of criminal cases, are both adequately protected if this court tests to determine whether appellant's subsequent admissions and consent to search

"were obtained by exploitation of the illegality of his arrest." *Brown v. Illinois*, 422 U.S. at 600; 95 S.Ct. at 2260; *Dunaway v. New York*, 442 U.S. at 217, 99 S.Ct. at 2259.

In testing to determine whether such exploitation occurred, the basic question to be answered is whether the presumed connection between this unconstitutional police conduct [appellant's illegal apprehension], and the incriminating admissions and the consent to search subsequently made by appellant during his interrogation by the CID, was nevertheless sufficiently attenuated to permit the use of the information gained therefrom at trial. *Dunaway v. New York* at 216, 99 S.Ct. at 2258; *see Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *see also, Brown v. Illinois*, 422 U.S. at 590, 95 S.Ct. at 2254. This type of inquiry is both fundamentally fair and will provide an effective deterrent to future police misconduct of a similar nature. Moreover, the exclusionary rule has never been applied so rigidly as "to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Brown v. Illinois*, 422 U.S. at 600, 95 S.Ct. at 2260, *citing, United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974).

■ The United States Supreme Court has identified "several factors" which must be considered in determining whether the appellant's admissions and consent to search were obtained by exploitation of an illegal arrest: (1) the temporal proximity of the arrest and appellant's admissions and consent to search; (2) the presence of intervening circumstances; and (3) "particularly", the purpose and flagrancy of the official misconduct. *Dunaway v. New York*, 442 U.S. at 218, 99 S.Ct. at 2259; *Brown v. Illinois*, 422 U.S. at 603–604, 95 S.Ct. at

---

28. Application of the *Payton* and *Dunaway* doctrines to military justice cases is in an infant stage of development. One need only examine the facts of this case to see the problems that law enforcement officials currently have in obtaining definitive legal advice concerning these matters.

2261–2262. However, this is not an inclusive listing. Thus, while *Miranda*-type warnings *"alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the [challenged evidence]," *Miranda*-type warnings "are an important factor ... in determining whether the [challenged evidence] is obtained by exploitation of an illegal arrest." *Brown v. Illinois,* 422 U.S. at 603, 95 S.Ct. at 2261.[29]

■ In regard to temporal proximity, only about 15 minutes elapsed from the time appellant was awakened until he was in the CID office being advised of his *Article 31-Tempia* rights. Thus, any psychological impact or coercion resulting from appellant's illegal apprehension would not be dissipated by the mere passage of time.

However, we find the presence of intervening circumstances in this case. After opening the door to appellant's room and thereby effecting a warrantless entry, the law enforcement officers chose to observe appellant visually from their position in the common hallway. Based on their visual observations of the naked appellant, coupled with appellant's failure to respond to the investigators' repeated loud knocking at the door, the investigators reasonably concluded in good faith that appellant was in need of immediate medical help. In view of this, the investigators physically entered appellant's room, attempted to obtain a normal response from him, and failing to do so, immediately called for medical assistance and notified Captain Kn of the situation. One of the paramedics arriving on the scene awoke appellant, questioned him, and visually examined him sufficiently to

ascertain that appellant was not under the influence of any intoxicants. During the course of the paramedics' observation of appellant, the investigative agents voluntarily subordinated their law enforcement goals to the medical goals of the former. Thus, for example, they did not ask appellant to accompany them to the CID office until after the paramedics had departed. We also note that at no time, either before or after the departure of the paramedics, did the investigators use force, physical restraints, threats or overt coercion on appellant to compel him to accompany them, nor did they expressly order appellant to accompany them. Rather, the apprehension and subsequent interrogative detention of appellant subtly arose from the totality of the circumstances surrounding this event. Based on these facts, we are satisfied that the concerned presence of the paramedics, before appellant was taken to the CID office, intervened to dissipate substantially any psychological impact on or presumed coercion of appellant caused by the *Payton* violation.[30]

Regarding the purpose and flagrancy of the official misconduct, we find that the investigators neither intended to abuse nor did abuse flagrantly appellant's constitutional rights. From the outset, the investigators had probable cause to apprehend appellant[31] and had reasonable grounds to believe he was in his room. Their actions were coordinated with Captain Kn, the judge advocate on-call officer, who, among other things, informed Major W that the military did not use arrest warrants. After appellant failed to respond to the prolonged, loud knocking on his door, the investigators again contacted Captain Kn for

---

**29.** Thus, the giving of a proper *Article 31-Tempia,* warning is both part of the threshold requirement for establishing that no Fifth Amendment violation occurred, *Dunaway v. New York,* 442 U.S. at 217, 99 S.Ct. at 2259, and a factor in determining whether an exploitation of the illegality of appellant's arrest occurred which would trigger the use of the exclusionary rule to effectuate the Fourth Amendment. *Brown v. Illinois,* 422 U.S. at 603, 95 S.Ct. at 2261.

**30.** We note, for example, that although appellant was surprised to find the medics and investigators in his room, he did not engage in any form of emotional outburst or otherwise challenge their authority to be in his room. Rather, he remained relatively calm and collected, and ultimately maintained that he required no further medical assistance.

**31.** *Cf. United States v. Cherry,* 759 F.2d 1196, 1212 (1980) (the intervening acquisition of probable cause is an important attenuation factor).

legal advice. Following Captain Kn's advice, the investigators obtained a pass key from the desk clerk and opened appellant's door.[32] Even then the investigators did not immediately enter the room, but stood in the common hallway and attempted to arouse appellant. Only after the investigators concluded that appellant appeared to need medical help did they physically enter appellant's room. After entering the room, the investigators acted in a manner which clearly exhibited their genuine concern for appellant's physical welfare. At no time during this encounter did the investigators search appellant's room—this being consistent with the legal advice they had received. At no time were threats, physical force, orders, or restraining devices used on appellant. At all times he was treated humanely. From the above and the totality of the relevant facts of record, we conclude that the investigators' misconduct was not flagrant and was not done purposefully to deprive appellant of his constitutional rights.[33]

Finally, we note that appellant properly was warned of his *Article 31/Tempia* rights and voluntarily waived those rights before making any admissions to the investigators. Moreover, we find that he voluntarily executed the written consent to search[34] form after being expressly advised, beyond the legal requirements of military law, "of [his] right to refuse to consent to a search...."

Thus, considering the above factors and all relevant evidence of record, we find that the investigators' illegal apprehension of appellant, in violation of the *Payton* doctrine, had been adequately attenuated, and that the derivative evidence in question

was admissible.[35] This assignment of error is without merit.

## V.

## BLOOD SPATTER EVIDENCE

Appellant asserts that the military judge erred in denying the defense motion *in limine* to exclude blood spatter evidence gathered from appellant's quarters.

During the course of their investigation, military investigators found numerous blood stains in appellant's quarters and on items of his household goods which had been removed from those quarters and placed into commercial storage or into his car. The majority of these stains were located in a single room in appellant's quarters. This room was identified at trial as the "infant's bedroom."

Over 1,000 stains were found in appellant's quarters and on his personal property which had been located in the quarters. Investigators subsequently performed laboratory tests on a representative sampling of these stains. Many of the stains were too small to test. Of the stains tested, 171 stains proved to be human blood. A number of other stains tested gave an indication of being some kind of blood, but due to sample size or other reasons, more specific identification was not possible through the use of scientific procedures.

For example, in the infant's bedroom, 401 suspected blood stains gave a positive reaction to a two-color test. Thirty-four of these stains were subjected to further laboratory testing. Twenty-nine of these stains were determined to be blood, and 23 of the 29 stains were large enough for their species to be identified as human blood. One stain was of sufficient size for typing and

---

32. We do not fault the legal adviser in this case as this is a complex and rapidly developing area of military law.

33. We also note in determining the scope and degree of the agents' misconduct that they were careful not to inform appellant of their prior search of his quarters before obtaining his consent to search.

34. *See generally, United States v. Christian,* 22 M.J. 519, 522–523 (N.M.C.M.R.1986) (test in reviewing consent search).

35. We further find that when subsequently searching both appellant's car and his household goods stored in Kansas, the CID were in possession of a commander's search authorization and a civilian search warrant, respectively, upon which they also, in good faith, relied. *See* n. 9, *infra.*

grouping as human blood "Group O, PGM 1 +", the blood type of the deceased. She was the only person in her immediate family with this particular grouping pattern. A daughter, Sophia, has group O, 2–1 + blood. Another daughter, Angelica, has group B, 2–1 + blood. The appellant also has group B, 2–1 + blood.

Laboratory tests of stains found on certain items of appellant's personal property yielded the following results: On a Pampers box, found in appellant's car and established as having been located in the infant's bedroom, 73 stains tested positive to a two-color test. Sixteen of these stains were selected for further testing, 15 of which were determined to be blood, and 11 of which were human blood stains. A comforter was tested and 30 stains, all of which tested positive to a two-color test, were selected for further testing. Twenty-three of the 30 stains were determined to be blood and 15 of these 23 stains were human blood. Three of these 15 human blood stains were large enough to group and were found to be group B blood. Group O human blood was found on two corners of a towel. An infant's crib had 161 stains which tested positive in a two-color test. Forty-one of the stains received further testing, and 39 of these stains were determined to be blood. Thirteen of the 39 stains were confirmed to be human blood. None of these stains were large enough to group. A blanket, seized in appellant's stored household goods, had 29 stains which tested positive. Twenty-three of these stains were determined to be blood, of which three were found to be human blood. One stain area was found to be PGM 1 + human blood. Some of the staining on the blanket appeared to have been washed or diluted. Human blood also was found on appellant's stereo set, a stereo speaker, a record album, and a night stand. We find that all of these items had been located in the infant's bedroom at the time of Yong Ok Ayala's death.

The nature of the wounds suffered by Yong Ok Ayala were such that she would have bled profusely at the situs of the attack. An expert in blood spatter stain interpretation testified, and we so find, that three major impact areas could be found in the infant's bedroom. The spatters were medium or high velocity impact spatters and were almost without exception too small for serological examination. To produce this type of small spattering "[i]t would have been a considerable blow, many of them to produce that much spatter throughout that room. A very deliberate and extended beating." "[T]he majority of the stains have the same trajectory ... the majority of the stains are type O blood." Further, the majority of the blood stains had been wiped or washed—an attempt had been made to remove them from the wall. The largest stain, found on the inset of the window of the infant's room, was grouped as O, PGM 1 +, the victim's blood type.[36] Although also characterized as a "directional blood splatter", we conclude that it was in fact blood cast-off of an instrument. This stain had not been diluted by being washed or wiped. Specifically, we find that this blood stain was Yong Ok Ayala's blood, and that it had been cast-off of the threaded instrument which appellant used to beat his wife to death.

Before admitting the blood spatter evidence, the military judge pertinently found that, regardless of whether the blood samples in question were a representative or an exhaustive sampling, the

[e]vidence of all of the reddish-brown stains or all of the stains identified as human blood would assist the trier of fact in resolving matters in issue.

[T]he defense objection goes to weight rather than admissibility.

[A]fter an appropriate circumstantial evidence instruction the evidence ... would be admissible. That is, the relevant factors would outweigh its possible prejudicial effect.

We find no legitimate basis for reversing the military judge's findings. The threshold question is whether the blood spatter

36. This stain is numbered 167 on Prosecution Exhibit 34.

evidence in issue was relevant within the meaning of MRE 401. In our view, all of the evidence concerning these reddish-brown stains would have a tendency to make it more probable, within the meaning of MRE 401, that appellant murdered his wife in his quarters as alleged by the government.[37] This is particularly true when the blood spatter and serological evidence are viewed and weighed in light of all other admissible evidence of record.

We also agree with the military judge that the probative value of this relevant evidence was not "substantially outweighed" by the danger of "unfair prejudice" or by any other factor required to be considered in applying the MRE 403 balancing test.[38] Compare the facts of this case with *United States v. Mustafa*, 22 M.J. 165 (C.M.A.1986) and *United States v. Garries*, 19 M.J. 845 (A.F.C.M.R.), *pet. granted* 21 M.J. 107 (C.M.A.1985). Further, when reviewing a trial level application of the MRE 403 balancing test to the operative case facts, appellate courts must give appropriate deference to the "discretionary call" of the military judge. "The appellant has the burden of going forward with conclusive argument that the judge abused his discretion." *United States v.*

*Mukes*, 18 M.J. 358, 359 (C.M.A.1984); *United States v. Wright*, 20 M.J. 518, 521 (A.C.M.R.), *pet. denied*, 21 M.J. 309 (C.M.A.1985). Appellant has failed to meet this burden. Accordingly, we find the blood spatter evidence to be admissible, MRE 402, and this assignment of error to be without merit.

In arriving at these conclusions, we are aware of other cases which have admitted blood spatter or stain evidence without requiring each of the spatters or stains to be typed. *United States v. Garries*, 19 M.J. 845; *see State v. Melson*, 638 S.W.2d 342, 365 (Tenn.1982); *Linder v. State*, 273 Ark. 470, 620 S.W.2d 944 (1981); *Brewer v. State*, 599 S.W.2d 141 (Ark.1980); *State v. Bauman*, 77 Wash.2d 938, 468 P.2d 684 (1970); *State v. Wheeler*, 74 Wash.2d 289, 444 P.2d 687 (1968).

## VI.

### VIEW OF THE PREMISES

Appellant asserts that the military judge erred in allowing, over defense objection, various views and inspections of appellant's quarters and of certain items of physical evidence which had been admitted

---

**37.** The blood spatter evidence was probative in this case, for example, by assisting in establishing (1) the origin of the blood; (2) the number of blows necessary to cause the stains and spatters; (3) the general locations where assaults occurred; (4) the direction of the blows; (5) the velocity required to make such spatters; (6) the duration and ferocity of the attack; (7) the fact that the victim was attempting to defend herself during the attack; (8) the reason why most of the stains were too small to type; and (9) the identity of certain stains as "cast off" stains.

**38.** "There is little doubt that the trial judge is given enormous leeway under this Rule [MRE 403] to judge the merits and demerits of admitting any evidence that satisfies the other Rules of Evidence." Military Rules of Evidence Manual, Saltzburg, Schinasi and Schlueter 342 (2d ed. 1986). Moreover, "[t]he use of the word 'substantially' in [MRE 403] suggests that in close cases the drafters intended that evidence should be admitted rather than excluded. If evidence is admitted, the trial judge can give explanatory or cautionary instructions to the court-members...." *Id.* at 343. In this case, the military judge, during his findings instructions, gave the court members a very detailed,

tailored explanatory instruction concerning circumstantial evidence. Included within this instruction was a thorough reference to the blood spatter and serological evidence and to certain permissible inferences which could be drawn therefrom. We are convinced that these instructions provided the members with a meaningful, accurate, and unbiased blueprint to aid them in resolving controverted issues of fact during their deliberations. *Compare United States v. Owens*, 21 M.J. 117, 124 (C.M.A.1985) ("prejudicial tendencies" of certain evidence "were substantially reduced" by military judge's limiting instruction), *with United States v. Bejar-Matrecios*, 618 F.2d 81, 84 (9th Cir.1980) (reversed where trial judge never instructed the court members why certain prejudicial, but admissible evidence, was admitted or how it could be used by the fact finders).

In reaching our determination in this matter, we also are aware that "the necessity of the evidence to prove the Government's case is a factor to be used in weighing its admissibility under balancing tests...." *United States v. Day*, 591 F.2d 861, 877 n. 29 (D.C.Cir.1978).

in evidence and repositioned in the quarters for the view.

After carefully considering the posture of the evidence before the court-martial members, the military judge allowed the members to view appellant's quarters. Consistent with evidence of record regarding their prior location in appellant's quarters, certain items[39] of personal property were allowed to be repositioned therein.

Rule for Courts-Martial [hereinafter cited as RCM] 913(c)(3) provides that "[t]he military judge may, as a matter of discretion, permit the court-martial to view or inspect premises or a place or an article or object." However, "[a] view or inspection should be permitted only in extraordinary circumstances." RCM 913(c)(3), Discussion.

Because the decision whether to grant a request for a view rests solely in the sound discretion of the military judge, the proper test of such a decision is that of abuse of discretion. *See United States v. Borner,* 12 C.M.R. 62, 66 (C.M.A.1953). Thus, we will not overturn the military judge's decision in the absence of clear abuse. *Cf. United States v. Thomas,* 22 M.J. 57, 59 (C.M.A.1986) (military judge's decision to grant or deny a continuance is within his broad discretion and, absent clear abuse will not be overturned); *United States v. Redmond,* 21 M.J. 319, 326 (C.M.A.1986)

(military judge has wide discretion in determining the admissibility of inflammatory evidence; and, absent a clear abuse of discretion, his determination to admit evidence will not be disturbed on appeal. No abuse of discretion found when military judge admitted a skull into evidence before a court-martial with officer members).

In the case at bar, two expert witnesses testified that many of the blood spatters were so small that a layman or person untrained to detect blood spatters might not have detected them in appellant's quarters. Testimony also was received that anyone could enter appellant's quarters, observe that certain blood spots on the walls apparently had been washed, and see the difference between the wiped and non-wiped blood spatters and stains. Testimony also exists that various spots in the closet were not quite as far apart, when viewed by looking back to the closet, as they appeared to be in a certain exhibit.

Based on the totality of the relevant evidence, including the above, the military judge found that "extraordinary circumstances" existed, and that "[a] view ... would assist the trier of fact in evaluating the weight to be given to the expert's testimony, and generally to evaluate ... the government's traumatic blood spatter theory and also ... the defense nosebleed theory."[40,41]

---

**39.** These items included the baby crib, a box of Pampers, a stereo and speakers, a nightstand (upon which the stereo was placed) and a wastebasket. These items all had been splattered with blood.

**40.** Before making his ruling, the military judge clearly considered the alterations that had been made to appellant's quarters since the investigation of the homicide, which was largely concentrated in appellant's quarters, had commenced. We do not find that the changes made either to these quarters or to the items of evidence repositioned therein were prejudicial to any substantial rights of appellant. The military judge twice instructed the court members regarding the effect of alterations made to the quarters during the investigation, and he instructed them in detail concerning the procedures to be used during the view. We find no reason to assume that the court members did not follow these instructions.

Further, mere alterations to the crime scene will not *per se* provide the basis for determining that a military judge clearly abused his discretion by permitting a view. *See People v. Rainge,* 112 Ill.App.3d 396, 68 Ill.Dec. 87, 445 N.E.2d 535 (1983) (jury viewed crime scene after victim testified as to certain crime scene changes); *Commonwealth v. Dominico,* 1 Mass.App. 693, 306 N.E.2d 835 (1974) (jury view during daylight hours was not an abuse of discretion though crime occurred at night); *see also, People v. Mallory,* 421 Mich. 229, 365 N.W.2d 673 (1984) (difference in weather and lighting conditions).

**41.** This court does not consider the activity of the court members during the view to constitute "the taking of evidence, but rather an attempt by them to relate the evidence heard at the trial to their present surroundings." *See generally United States v. Zinsmeister,* 48 C.M.R. 931, 935 (A.F.C.M.R.1974). We agree that generally "a

Considering the posture of the evidence at the time the military judge authorized the view, we do not believe either that his finding of "extraordinary circumstances" was incorrect or that he clearly abused his discretion in authorizing the view.[42]

This assignment of error is without merit.

## VII.

### SUFFICIENCY OF THE EVIDENCE TO ESTABLISH SPECIFIC INTENT TO KILL AND PREMEDITATION

Appellant asserts that the government failed to introduce any evidence to establish premeditation. Specifically, he asserts that no evidence was introduced on which a court could find beyond a reasonable doubt that he had committed this offense "with a specific intent to kill accompanied by prior consideration of his act."

■ Both specific intent to kill and premeditation can be proven by circumstantial evidence. MCM, part IV, para. 43c (2)(a); *United States v. Barnes*, 15 M.J. 121, 123 (C.M.A.1983); *United States v. Cruz*, 17 M.J. 534, 536 (A.C.M.R.1983); *United States v. Stark*, 19 M.J. 519, 523 (A.C.M.R. 1984). The existence of these elements can be established based on inferences drawn on the circumstances surrounding the killing, including the viciousness or cruelty of the assault. *United States v. Ayers*, 34

C.M.R. 116, 123 (C.M.A.1964); *United States v. Matthews*, 13 M.J. 501, 517 (A.C. M.R.1982) (en banc), *aff'd sentence rev'd on other grounds*, 16 M.J. 354 (C.M.A. 1983); *United States v. Cruz*, 17 M.J. at 536; *see United States v. Teeter*, 16 M.J. 68 (C.M.A.1983) (victim's throat slit followed by stabbing her 32 times).

■ The evidence of record establishes, and we so find, that the appellant's homicidal assault upon his wife, Yong Ayala, was brutal and vicious. Appellant repeatedly struck his wife with a threaded object, such as a pipe, large bolt or file. Although Yong Ayala attempted vainly to defend herself and in the process received "classic defense wounds" on her hands and arms, she was struck at least 12 times. From these forceful blows, she received about 13 lacerations, abrasions or bruises of the skin surface, a fractured jaw, and multiple skull fractures and bruises under the scalp surface. The multiple fractures of her skull resulted in seven loose bone pieces. She also received a puncture-type wound of the left elbow and a round hole-type wound over the right ear (which originally was erroneously suspected of being a gunshot wound). She bled profusely as a result of the wounds.

None of these wounds were of such a nature as to cause Yong Ayala's immediate death. Ultimately she died from a loss of blood coupled with a swelling of the tissue

view is not intended as evidence; it is intended simply to aid the trier of fact in understanding the evidence." *Mears v. Indiana*, 455 N.E.2d 603, 605 (Ind.1983). Assuming *arguendo* that some evidence had been taken by the court members during the view, we are satisfied that it would have been merely cummulative, and that appellant's substantial rights were not materially prejudiced thereby. Article 59(a), UCMJ; *see also United States v. Jeanbaptiste*, 5 M.J. 374, 376 n. 3 (C.M.A.1978) (erroneous ruling may be found to be not prejudicial on the basis of entire record), *citing Wallace v. United States*, 412 F.2d 1097, 1102 n. 4 (D.C.Cir.1969); *United States v. Farris*, 21 M.J. 702, 705 (A.C.M. R.1985) (harmless error).

42. As we have repeatedly stated in resolving abuse of discretion issues, the test is not what action this court would have taken if faced with the issue at trial. Part of the responsibilities of

the military judge for managing and controlling courts-martial include the responsibility for determining when extraordinary circumstances factually exist warranting the authorization of a crime scene view. Although views should not normally be conducted, we will not second-guess a decision of a military judge to authorize a view without valid grounds existing for finding a clear abuse of discretion. In the absence of such an abuse, we will "zealously defend the military trial judge's authority to manage the proceedings over which he presides" and will not reverse his rulings concerning the view. *Cf. United States v. Thomas*, 22 M.J. 57, 59 (C.M.A. 1986), *citing United States v. Browers*, 20 M.J. 356, 360–361 (C.M.A.1985) (Cox, J. concurring) ("[W]e must continue to give military trial judges the responsibility and authority to manage and control courtsmartial.")

of her brain caused by the repeated blunt instrument blows inflicted upon her by appellant.

Based on the above facts and all relevant and competent evidence of record, we find beyond a reasonable doubt that at the time appellant murdered his wife, Yong Ayala, he already had formed both the requisite specific intent and the requisite premeditated design to kill by giving consideration to the act intended to cause her death.[43]

Thus, we conclude that this assignment of error is without merit.

The findings of guilty and the sentence are affirmed.

Judge CARMICHAEL and Judge ROB-BLEE concur.

---

**43.** We also find from the direct and circumstantial evidence of record that appellant had a motive for murdering his wife; specifically, he was unhappy with his wife and his marriage and wanted to terminate both.